WESTERN NATIONAL MUTUAL INSURANCE CO., PETITIONER
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11620–91.        Filed February 28, 1994.

*Jay B. Kelly, E.P. Baker,* and *Peter H. Winslow,* for petitioner.

*J. Anthony Hoefer,* for respondent.

GERBER, *Judge:* Respondent determined an $89,366 Federal income tax deficiency for petitioner's 1987 taxable year. The issue remaining in controversy is whether petitioner engaged in reserve strengthening within the meaning of section 1023(e)(3)(B) of the Tax Reform Act of 1986 (TRA 86), Pub. L. 99–514, 100 Stat. 2404. In that context, we consider whether section 1.846–3(c), Income Tax Regs., is valid and more specifically whether the definition of reserve strengthening contained in the regulation comports with the statute and congressional intent.

## FINDINGS OF FACT

The facts stipulated by the parties are incorporated by this reference. Petitioner, a property and casualty (PC) insurance company, is a corporation organized under the laws of the State of Minnesota with its principal office in Minneapolis, Minnesota.

Initially (petitioner was organized in 1900), most of petitioner's insurance coverage involved dairy properties in Minnesota, Wisconsin, and Iowa. Since then petitioner has expanded its risk coverage by offering fire, homeowners, worker's compensation, and automobile liability insurance. In connection with the period under consideration, petitioner's business predominantly consisted of automobile coverage, followed by worker's compensation, with fire, allied lines, and homeowners policies comprising most of the remaining insur-

ance coverage. While a majority of petitioner's business is in Minnesota, it is licensed to do business in Wisconsin, Iowa, North Dakota, and South Dakota.

For each State in which it is licensed to do business, a PC company is required to file an annual statement with the State insurance commissioner in the format prescribed by the National Association of Insurance Commissioners (NAIC). The primary purpose of the annual statement is to provide State regulatory agencies the information necessary for monitoring the financial solvency of the insurance companies, regulating insurance businesses, and verifying compliance with State insurance laws and regulations. The NAIC annual statement includes a balance sheet, a statement of income, a capital and surplus account, a statement of cash-flow, an underwriting and investment exhibit, historical data, schedules, and responses to questions, as well as information on premiums, losses, and dividends to policyholders. Petitioner filed its NAIC annual statements with the State commissioner of insurance for each State in which it was licensed to do business for the years 1984 through 1991.

PC companies are required to maintain loss reserves to ensure the payment of claims that have occurred but have not been paid by or reported to the insurer as of the NAIC annual statement filing date, typically December 31 of each year.

Petitioner's loss reserves generally include four components or categories: (1) Claims already reported to petitioner (case reserves); (2) amounts that will be paid on claims that can statistically be presumed incurred but are not yet reported to petitioner (IBNR reserves); (3) expected future changes in the case reserves (bulk reserves); and (4) loss adjustment expenses not included in (1) through (3) (LAE reserves).[1] Bulk reserves were not held by petitioner as of 1986 yearend for pre-1986 accident years.

Petitioner's loss reserves consisted predominantly of case reserves. Its claims department established the case reserves from data contained in loss reports and policy files. These reserves were established and maintained on a case-by-case

---

[1] Loss adjustment expenses (LAE) are typically divided into two general categories, allocated expenses (those which can be assigned to a specific claim, such as attorney's fees and court costs) and unallocated expenses (those not assigned to a specific claim such as, costs associated with an in-house claims department and overhead).

basis and the amounts were dependent on the facts and circumstances of each claim or case. Petitioner's 1985 and 1986 case reserves were established in the same manner and totaled $23.6 million and $30 million, respectively.

From 1963 through the period in controversy, George Klouda, petitioner's president and general manager, was responsible for establishing the amount of the IBNR reserve. The IBNR reserve was determined for each line of business by means of a computer program model which included a 1-year historical development of IBNR, the level of premiums, and judgmental factors (such as an estimate for inflation). If, at yearend, based on emerging claims experience against previous IBNR reserves, it was Mr. Klouda's judgment that IBNR reserves were not adequate and an increase in IBNR reserves was warranted, any such increase to the IBNR reserves was reflected as part of the current accident year claims and not as an adjustment to IBNR for prior accident years. This method for computing IBNR was used to report IBNR on the 1985 and 1986 NAIC annual statement. Using this method, petitioner held IBNR reserves of $3.3 million for year 1985 and $4.4 million for 1986.

Petitioner did not change its reserve assumptions or methodology from prior years in computing its 1986 loss reserve. By the end of 1991 it was evident that petitioner's 1985 and 1986 loss reserves were both deficient, as opposed to overstated.

Mr. Klouda was also responsible for determining petitioner's LAE reserves. These were also computed by means of a formula. Mr. Klouda combined all of petitioner's lines of business and compared total losses paid in a preceding 3-year period to the LAE paid during the same 3-year period. Total LAE was computed by applying the average 3 years of the paid-to-paid ratios to IBNR and by applying one-half of the ratios to case reserves. The final value was then judgmentally adjusted. This method was employed for 1985 and 1986. Using this method, petitioner held yearend LAE reserves of $3 million for 1985 and $4.2 million for 1986.

Respondent, mechanically following the calculation set forth in section 1.846–3(c), Income Tax Regs., determined that petitioner had engaged in reserve strengthening in the amount of $1,383,383 in 1986 with respect to pre-1986 claims. Using the discounting principles set forth in section

846,[2] respondent determined that petitioner's 1987 taxable income was understated by $223,025. Respondent did not question the approach, method, or any specific changes which occurred in connection with petitioner's reserves. Instead, respondent employed the regulation's formula, which assumes that any net increase to reserves constitutes reserve strengthening.

The formula set forth in section 1.846–3(c)(3)(i), Income Tax Regs., was employed for each of petitioner's lines of business. That formula concerns accident years before 1986. Under that formula the reserves for 1985 as of the end of the 1985 year are reduced by claims and LAE paid regarding those reserves in 1986. To the extent that reserves for 1985 existing at the end of 1986 exceed that amount, it is treated as a net increase to the reserve. To the extent the result is less, it is negative and treated as a net decrease to the reserve.

Respondent's computations resulted in the following "increases" or "decreases" to reserves in petitioner's lines of business:

| Line of insurance | Increase (decrease) |
|---|---|
| Auto liability | $554,503 |
| Other liability | 238,533 |
| Worker's compensation | 1,729,542 |
| Multiple peril | (135,345) |
| Fire | (300) |
| Allied lines | 500 |
| Inland marine | (23,265) |
| Auto physical damage | (1,083,226) |
| Glass | (437) |
| Burglary and theft | -0- |
| Reinsurance | 102,878 |
| Net totals | 1,383,383 |

OPINION

*Background*

Subchapter L, involving insurance companies, is a highly specialized portion of the Internal Revenue Code which is

---

[2] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

replete with the unique nomenclature of the insurance industry. We are asked here to construe the term "reserve strengthening", a specialized insurance concept which was used by Congress in TRA 86 section 1023(e)(3). As part of TRA 86, Congress changed certain aspects for reporting income by property and casualty companies. Because some of these changes would have likely resulted in the reporting of more income, Congress permitted some relief from the initial change by exempting certain items. However, to avoid abuse, the portion of the increase in the taxpayers' reserves which constituted reserve strengthening was not to be exempted. The parties maintain distinctly different definitions of the term "reserve strengthening". To better understand the unique terms and nuances in the parties' arguments, it is helpful to first consider some of the background concerning the taxation of PC insurance companies.

Prior to TRA 86, PC insurance companies recognized premium income when earned rather than when received, sec. 832(b)(3) and (4); sec. 1.832–4(a)(3), Income Tax Regs., and claims or losses of claimants were deducted when "incurred" without consideration of when such losses were paid. Sec. 832(b)(6). This was in contrast to the accrual method of tax accounting under which the liability must be fixed and determinable with reasonable accuracy. Prior to TRA 86, PC companies were generally entitled to deduct the full amount of their unpaid losses in calculating taxable income. Treatment for tax purposes generally followed the amount of unpaid losses accounted for in the NAIC annual statement. Because PC companies do not use the more traditional versions of the cash or accrual methods of accounting, the annual statement has been used as a guideline for determining the timing of taxable income. Sec. 832(b)(1). The NAIC annual statement accounting principles are incorporated, with qualifications, into certain provisions of the Internal Revenue Code applicable to PC companies.

Prior to TRA 86, the PC companies were entitled to a deduction for "losses incurred" computed as (1) losses paid during the taxable year (plus or minus the change in salvage and reinsurance recoverable for the year), plus (2) all unpaid losses outstanding at the end of the taxable year, minus (3) unpaid losses outstanding at the end of the preceding year. A deduction was also allowed for "expenses incurred", includ-

ing estimates of future costs of adjusting claims (loss adjustment expenses or LAE). In this way, PC insurance companies were permitted to deduct the full amount of the net increase in their unpaid losses in calculating taxable income. Accordingly, prior to 1987 PC companies could deduct more than the current cost of claimed losses. The longer the period between the accident or loss year and the year the claim was actually paid, the greater the benefit attributable to the insurer's deduction. Having concluded that prior law did not accurately measure the income of PC's, Congress, in TRA 86, changed the tax treatment of unpaid loss deductions for such companies.

The change was accomplished by means of a discounting method. To implement the discounting of unpaid losses, section 832(b)(5) was amended to provide that the deduction for losses incurred is to be determined by reference to discounted unpaid losses. In other words, the deduction for these reserves is limited to the amount of discounted unpaid losses and LAE. Section 846 was added to define "discounted unpaid losses". The discounted unpaid loss provisions are generally effective for tax years beginning after December 31, 1986, with the exception of certain transitional rules, discussed *infra*.

The amount of the discounted unpaid losses as of the end of any tax year is the sum of the discounted unpaid losses separately computed with respect to unpaid losses in each line of business attributable to each accident year. Sec. 846(a)(1). The term "unpaid losses" under section 846(f)(2) includes reported losses, incurred but not reported losses, resisted claims, and loss adjustment expenses. The discounting methodology is applied by line of business for each accident year and is set forth in section 846(a)(2). Where the unpaid losses shown on the NAIC statement have already been discounted, and certain other criteria are met, a company may gross up its discounted unpaid losses to determine its undiscounted unpaid losses.

The availability of this grossup, however, provides taxpayers an opportunity to artificially inflate their undiscounted losses by overstating the amount by which their unpaid losses are discounted in the annual statement. To close this loophole by which taxpayers could effectively negate the application of the discounting requirements, TRA

86 provides that the amount of the discounted unpaid losses cannot exceed the aggregate amount of unpaid losses with respect to any line of business for an accident year as reported on the annual statement. Sec. 846(a)(3).

Although the loss reserve discounting provisions generally apply to tax years beginning after December 31, 1986, it was necessary to select a starting point for the discounting of unpaid losses. TRA 86 section 1023(e)(2) provides a transitional rule with respect to unpaid losses on the effective date of the provision. Under the transitional rule, the unpaid losses as of the beginning of the first tax year beginning after December 31, 1986, are determined as if the loss reserve discounting provisions had applied. The discount for the pre-1987 unpaid losses (assuming a calendar year PC) is determined under the method set forth in section 846(a)(2) concerning the loss payment pattern applicable to accident years ending in 1987.

The transitional rules also provide for a "fresh start" with respect to unpaid losses applicable to the last tax year beginning before January 1, 1987. This is accomplished by determining the difference between the amount of the unpaid losses for the year preceding the first tax year beginning after December 31, 1986, and the amount determined under sec. 846(a)(2) for unpaid losses as of the beginning of the first tax year beginning after December 31, 1986. This difference is the fresh start and is not taken into account for purposes of determining taxable income after the effective date. Commentary in the legislative history describes the fresh-start adjustment as "a forgiveness of income—for the reduction in reserves resulting from discounting the opening reserves in the first post-effective date taxable year of the provision." H. Conf. Rept. 99–841 (1986), 1986–3 C.B. (Vol. 4) 1, 367. Accordingly, the difference between the undiscounted and discounted unpaid loss is forgiven.[3] The congressional com-

---

[3] Example: XYZ insurance company's undiscounted and discounted unpaid losses as of Dec. 31, 1986, are:

| | |
|---|---|
| Undiscounted unpaid losses—12/31/86 | $100.00 |
| Discounted unpaid losses—12/31/86 | 96.58 |
| Fresh start | 3.42 |

Under prior law, a current deduction was allowed for the full amount of future loss payments; i.e., a deduction of $100. Under the Tax Reform Act of 1986 (TRA 86), Pub. L. 99–514, 100 Stat.

mentary also contains an indication that the fresh start will not apply to any reserve strengthening in a tax year beginning in 1986, and such strengthening is treated as occurring in the taxpayer's first tax year beginning after December 31, 1986. Reserve strengthening for tax years beginning after December 31, 1985, is not treated as a reserve amount for purposes of determining the fresh-start amount. Instead, reserve strengthening additions to loss reserves for tax years beginning in 1986 are treated as changes to reserves in tax years beginning in 1987, and are subject to discounting. TRA 86 sec. 1023(e)(3)(B); H. Conf. Rept. 99–841, *supra,* 1986–3 C.B. (Vol. 4) at 367; Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 618 (J. Comm. Print 1987) (hereinafter General Explanation).

Similar to concerns of artificial manipulation addressed by section 846(a)(3), the denial of the fresh-start provisions to 1986 reserve strengthening is explained in the conference report and General Explanation as follows:

This provision [denying fresh start for reserve strengthening] is intended to prevent taxpayers from artificially increasing the amount of income that is forgiven under the fresh start provision. [H. Conf. Rept. 99–841, *supra,* 1986–3 C.B. (Vol. 4) at 367.]

*The Parties' Positions*

Respondent determined that petitioner understated its 1987 income by failing to include $223,025 in income. That amount is the discount (determined under the 1987 formula) attributable to petitioner's total net additions of $1,383,383 to its unpaid losses and LAE reserves established for pre-1986 accident years.[4] Respondent contends that any increase to reserves (the $1,383,383 addition in this case) constitutes reserve strengthening by petitioner.

Petitioner contends that the term "reserve strengthening" used by Congress in TRA 86 section 1023(e)(3) is an insurance industry term of art and should be interpreted in a manner consistent with its commonly understood usage. More specifi-

2085, the unpaid losses as of Dec. 31, 1986, are required to be discounted and a fresh start is provided. Accordingly, the difference between the undiscounted and discounted unpaid loss is forgiven, and XYZ receives a benefit of $3.42 from the fresh start.

[4] While the regulation provides a separate formula for calculating reserve strengthening for a reserve established for the 1986 accident year, respondent's determination is based solely on additions to reserves determined under the formula applicable to reserves established for pre-1986 accident years.

cally, petitioner contends that reserve strengthening, as used in the PC industry: (1) Is nonperiodic; (2) involves a material change in methodology and/or assumptions from one valuation date to the next; (3) results in a change in the reserve's adequacy level from what it otherwise would have been; and (4) applies to the aggregate yearend reserves of an insurance company. Petitioner maintains that the increases to its 1986 reserves for pre-1986 accident years as determined by respondent do not constitute "reserve strengthening" as that term is used in the insurance industry. Further, petitioner maintains that industry usage and prior legislation support the position that reserve strengthening, as used in the statute, has an established meaning which would not include any of the additions made to petitioner's reserves. Finally, petitioner maintains that even if respondent's interpretation of the legislative history is correct and the separate application of a mechanical test to reserves for pre-1986 accident years is required, respondent's regulations do not accurately implement the mechanical test. Petitioner asserts that erroneous results are reached because the regulations mistakenly apply the mechanical test to loss reserves on an accident year/line-of-business basis, rather than to each separate claim reserve.[5]

Respondent maintains that any increase to a reserve is reserve strengthening. Respondent relies upon the committee reports and the regulation for her position. Accordingly, respondent does not agree that strengthening is attributable only to a change in reserve-setting methodology or that it is necessary to consider whether there is an element of artificiality in the reserve setting action. Respondent acknowledges that reserve strengthening has an established definition in the life insurance industry, but contends that the term has no commonly accepted or recognized meaning within the PC industry.

It is important to note that respondent agrees that petitioner's additions to its reserves were reasonable and that the reserves were determined in accord with petitioner's

---

[5] We conclude that the regulations promulgated by the Secretary do encompass all additions to the reserve. Further, we conclude that should we determine that the phrase "all additions to reserves" encompasses upward revisions of losses incurred in prior periods, we find no basis for rejecting respondent's regulatory approach in favor of petitioner's claim-by-claim analysis.

prior practices and procedures.[6] Because respondent argues that any addition to the reserve constitutes reserve strengthening and is therefore not entitled to the fresh start, respondent's position renders the nature of or reason for the increase irrelevant. Respondent does not question whether petitioner's reserve additions would represent reserve strengthening by reference to the definition advanced by petitioner. Due to respondent's concession in this case, we do not have to address the question of whether petitioner attempted to "artificially" increase its reserve to take advantage of the fresh-start provisions.

## The Statute, Regulations, and Legislative History

TRA 86 section 1023(e)(3)(B), 100 Stat. 2404, provides as follows:

(B) Reserve strengthening in years after 1985.—* * * [The fresh start] shall not apply to any reserve strengthening in a taxable year beginning in 1986, and such strengthening shall be treated as occurring in the taxpayer's 1st taxable year beginning after December 31, 1986.

The statute contains but does not define the term "reserve strengthening". Section 1.846–3(c), Income Tax Regs.,[7] on the other hand, provides rules for determining reserve strengthening, in pertinent part as follows:

(c) Rules for determining the amount of reserve strengthening (weakening).—(1) In general. The amount of reserve strengthening (weakening) is the amount that is determined under paragraph (c)(2) or (3) to have been added to (subtracted from) an unpaid loss reserve in a taxable year beginning in 1986. For purposes of section 1023(e)(3)(B) of the 1986 Act, the amount of reserve strengthening (weakening) must be determined separately for each unpaid loss reserve by applying the rules of this paragraph (c). This determination is made without regard to the reasonableness of the amount of the unpaid loss reserve and without regard to the taxpayer's

---

[6] On brief, respondent stated:

Respondent does not dispute petitioner's allegations regarding the propriety of its reserving methods or its motivations in determining its reserves. * * *

Respondent, in her notice of deficiency, attributed the petitioner with no *artificial* increase to its reserves. Respondent did not proscribe the method that petitioner used to compute its reserves. Respondent did not premise her determination on the occurrence of *artificial* additions to the reserves. Indeed, respondent has stipulated that petitioner's unpaid loss reserves for 1986 and the additions thereto were fair and reasonable estimates.

[7] It should be noted that this regulation was not proposed or adopted in final form until after petitioner filed its returns for the taxable periods under consideration and petitioned this Court for redetermination. More specifically, the sec. 846 regulations concerning TRA 86 were not formally adopted until sometime in 1992.

discretion, or lack thereof, in establishing the amount of the unpaid loss reserve. The amount of reserve strengthening for an unpaid loss reserve may not exceed the amount of the reserve, including any undiscounted strengthening amount, as of the end of the last taxable year beginning before January 1, 1987. For purposes of this section, an "unpaid loss reserve" is the aggregate of the unpaid loss estimate for losses (whether or not reported) incurred in an accident year of a line of business.

* * * * * * *

(3) Accident years before 1986. (i) In general. For each taxable year beginning in 1986, the amount of reserve strengthening (weakening) for an unpaid loss reserve for an accident year before 1986 is the amount by which the reserve at the end of the taxable year exceeds (is less than)—

(A) The reserve at the end of the immediately preceding taxable year; reduced by

(B) Claims paid and loss adjustment expenses paid ("loss payments") in the taxable year beginning in 1986 with respect to losses that are attributable to the reserve. * * *

Essentially, the regulation provides that any increase in a reserve for a pre-1986 accident year is a strengthening.[8] Although petitioner argues that the regulation is ambiguous and could be read either way, we are convinced that the regulation defines any increase to the reserve as a reserve strengthening which should be excluded from the fresh-start provisions. Respondent's interpretation of reserve strengthening and the promulgation of the regulations are based upon the following language found in the conference report:

*Reserve strengthening is considered to include all additions to reserves attributable to an increase in an estimate of a reserve established for a prior accident year* (taking into account claims paid with respect to that accident year), *and all additions to reserves resulting from a change in the assumptions* (other than changes in assumed interest rates applicable to reserves for the 1986 accident year) used in estimating losses for the 1986 accident year, *as well as all unspecified or unallocated additions to loss reserves.* * * * [H. Conf. Rept. 99–841 (1986), 1986–3 C.B. (Vol. 4) 1, 367; emphasis supplied.]

---

[8] Petitioner points out that the mechanical approach of the regulation can cause absurd results. For example, if a PC company establishes four case reserves of $500 each, it will have total reserves of $2,000. If two of the cases are settled for $750 each or a total of $1,500 in the following year, the remaining loss reserve would be $1,000. Under the mechanical method of the regulation, this would result in $500 of reserve strengthening. This is so because computation of "reserve strengthening" under sec. 1.846–3(c), Income Tax Regs., would require the second-year reserves ($1,000) to be reduced by $500, which is the difference between the first-year reserves of $2,000 and the second-year payments of $1,500. Under the approach in the regulation reserve strengthening exists only by the regulation's mechanical definition, but no strengthening exists in fact.

The prior Senate Finance Committee report, however, did not use the all additions language, but instead defined reserve strengthening as follows:

The committee intends that any adjustments to reserves that are attributable to changes in reserves on account of *changes in the basis for computing reserves (i.e., reserve strengthening or reserve weakening)* * * * [S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1, 510; emphasis supplied.]

Accordingly, we are confronted with a situation where Congress utilized a technical insurance industry term in a statute, but the statute itself does not define it. Further, in the promulgation of the regulation, there was reliance upon a possible explanation of the term in the legislative history which is substantially different from and broader than the customary industry usage. Moreover, the portion of the legislative history relied upon by respondent conflicts with other portions of the legislative history and seems broader than is necessary to accomplish the stated purpose of preventing abuse from artificial increases. This situation is further complicated by the fact that Congress used the same term in prior legislation (1984) concerning life insurance companies, wherein it is clear that the term was used in its technical industry parlance. These somewhat circuitous circumstances make the path to the solution of this controversy more perplexing. Common to the consideration of all of the parties' arguments is the meaning of the term "reserve strengthening". Accordingly, we consider that concept first.

*The Definition of Reserve Strengthening*

a. *Insurance Reserves*

The term "reserve" is used differently in the insurance industry than it is in certain other commercial situations. In insurance parlance, reserves are not considered to be trust funds or funds in escrow. *Security Ben. Life Ins. Co. v. United States,* 517 F. Supp. 740, 747 (D. Kan. 1980), affd. 726 F.2d 1491 (10th Cir. 1984). In the insurance industry a policy reserve represents a liability; i.e., it represents an obligation to the policyholders. Historically, reserves have been described in PC insurance literature as estimated liabilities for losses and loss adjustment expenses.[9] To some extent,

---

[9] Reserves are "'best estimates' of future settlement costs." Salzmann, Estimated Liabilities

loss reserves are estimates extrapolated from past trends, patterns, averages, and inferences and predictions as to the future. Accordingly, "The reserve simply operates as a charge on so much of an insurance company's assets as must be maintained in order for the company to be able to meet its future commitments under the policies it has issued." *Id.* at 747. The general concept of reserves is the same for life and PC insurance companies.

b. *Reserve Strengthening* [10]

Generally, increases in a company's reserves are either attributable to (1) normal additions made each year to fund existing and increasing obligations under policies in force; or (2) additions required when a method or assumption used in calculating policy reserves is changed so as to produce higher reserves. The latter or less usual occurrence has been described as reserve strengthening. See *Jefferson Standard Life Ins. Co. v. United States,* 272 F. Supp. 97, 121 (M.D.N.C. 1967), affd. in part, revd. in part and remanded 408 F.2d 842 (4th Cir. 1969).

In *National Life & Accident Ins. Co. v. United States,* 381 F. Supp. 1034 (M.D. Tenn. 1974), affd. 524 F.2d 559 (6th Cir. 1975), the Court of Appeals analyzed sections 809 and 810 and recognized a distinction between normal reserve increases and reserve increases "'attributable to reserve strengthening'". 524 F.2d at 560 (quoting section 1.809–5(a)(III), Income Tax Regs.). Reserve strengthening/weakening was defined by the District Court as resulting from a change in an actuarial assumption which produces a larger/smaller reserve than would have been achieved had the old assumption been used. *National Life & Accident Ins. Co. v. United States,* 381 F. Supp. at 1037. Reserve strengthening is but one way in which a company's reserves could be increased in a given year, and all other reserve increases (not attributable to reserve strengthening) are "normal reserve increases". *Id.* at 1038.

---

For Losses & Loss Adjustment Expenses 155 (1984).

[10] The parties offered numerous expert witnesses to address the concept of reserve strengthening. Their opinions and testimony did not establish a universal and precise definition of reserve strengthening, but provided sufficient guidance to enable our recognition of the conceptual elements involved in industry jargon. Although, in general industry usage, the term reserve strengthening denotes an increase, it is not applied to every increase to an insurance company's reserves.

A normal reserve addition for claims incurred in previous periods is made by an insurance company to reflect new information (such as the number or magnitude of claims) relating to that company's liability for such claims. In contrast, reserve strengthening is limited to a change in the formula or mechanism for calculating a reserve, which would produce a larger reserve amount without regard to such new information.[11] Thus, the term "reserve strengthening" is confined to a change in the basis for calculating the current reserve for claims incurred in a previous period (for which a reserve computed on a different basis had been held prior to the current period).[12]

Respondent acknowledges that the term "reserve strengthening" has a commonly understood industry meaning in the life insurance area, but argues that no such industry-wide definition exists in the PC insurance field. Petitioner counters that it is a common practice of all insurance companies, PC as well as life, to extrapolate from past trends in order to make educated predictions about the future.[13] Also,

[11] The strengthening of reserves is necessary when experience renders invalid the original reserve assumptions. One of the primary purposes of policy reserves is to permit an orderly development of the company's financial position. If underlying assumptions in the reserves no longer reflect current and future experience, in the absence of reserve strengthening, the company's financial position will become distorted. This distortion may then create future drains on surplus as the actual losses materialize. In short, if reserves are not strengthened, true surplus becomes overstated. The company, in recognizing this danger, must then revise its reserves and use more realistic assumptions, which revision is called reserve strengthening. The ordinary increases in reserves during each year are charged to net gain from operation. It would be inappropriate, however, to include in this annual charge the one-time, extraordinary increase due to reserve strengthening, so the latter increase is charged instead directly to surplus. * * * [Carter, "Capital and Surplus Accounts", in Insurance Accounting and Statistical Association, Life Insurance Accounting 147, 163 (Strain ed. 1977).]

[12] However, the legislative history of TRA 86 sec. 1023(e)(3) provides that, for purposes of that section, the term also includes a change in the basis (except for a change in assumed interest rates applicable to reserves for the 1986 accident year) for calculating the reserves for taxable years beginning in 1986 for claims incurred in that year (for which no reserves had previously been computed). We infer that this aspect of the committee report refers to the use of a basis that is different from the one employed to compute the reserves for similar claims incurred in prior periods. See H. Conf. Rept. 99–841 (1986), 1986–3 C.B. (Vol. 4) 1, 367.

[13] The term "reserve strengthening" appears in the glossary section of a treatise on the Federal taxation of insurance companies with a signal to see "policy reserve strengthening". Policy reserve strengthening is defined as

The voluntary transfer of amounts from surplus to policy reserves to provide for the future policy benefits on more conservative assumptions. Such a transfer may be due to the use of a lower interest assumption or a different experience table coupled with the assumption of the same or a lower rate of interest in the valuation of the respective benefit contracts than was employed in the respective valuation of the previous year end. [KPMG Peat Marwick, Federal Taxation of Insurance Companies, par. 40.01, at 4038 (1993).]

It is interesting to note that in this text which covers both life insurance companies and PC companies, the definition (unlike some other glossary entries) does not specify that it is a term

petitioner relies heavily on the fact that in enacting the life insurance provisions contained in the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, Congress used the term "reserve strengthening" in a manner consistent with its classic definition. In that earlier legislation, which modified the provisions of subchapter L relating to the computation of life insurance reserves, Congress also provided a fresh-start transition rule. To provide relief from the effect of the new provisions, DEFRA section 216(b), 98 Stat. 758, provided a fresh start under which any change in reserve methods attributable solely to the new rules was not regarded as a change in method for calculating reserves, and therefore would not cause recognition of the resulting gain or loss. Under the fresh start of DEFRA section 216(b), the difference between a company's closing 1983 reserves and its opening 1984 reserves attributable to the required change in reserve computation was disregarded; i.e., forgiven, for tax purposes. Similarly to TRA 86, DEFRA limited the fresh-start adjustment. Under DEFRA's restrictions the fresh-start benefit was unavailable for certain reinsurance transactions and for "any reserve strengthening reported for Federal income tax purposes after September 27, 1983, for a taxable year ending before January 1, 1984." DEFRA sec. 216(b)(3)(A)(ii), 98 Stat. 759.

Respondent agrees that the use of reserve strengthening in connection with DEFRA was in accord with life insurance industry usage,[14] but contends the term has no well-defined meaning in the PC industry. In support of this contention, respondent, quoting from the report of petitioner's expert, Irene Bass, points out that the NAIC does not specifically define reserve strengthening with respect to reporting requirements for the filing of information contained in the annual statement for PC insurers. Ms. Bass' report includes the statement, however, that although NAIC does not specifi-

applicable to only life insurance companies.

[14] It should also be noted that the concept of reserve strengthening also appears in its traditional insurance industry parlance in sec. 1.810–2(c)(2), Income Tax Regs., which requires that increases or decreases attributable to a change in the basis of computing reserves should not be taken into account as ordinary decreases in reserves, but rather are to be taken into account as provided by sec. 810(d) and sec. 1.810–3(a), Income Tax Regs. That regulation uses the term "reserve strengthening or weakening" to describe such increases or decreases attributable to a change in the basis of computing such reserves. The phrase "change in the basis of computing such reserves" also appeared in sec. 818(c), where "basis" has been interpreted to mean "method". *Reserve Life Ins. Co. v. United States,* 229 Ct. Cl. 529, 640 F.2d 368, 377 (1981).

cally define the term, the annual statement provides guidelines useful in identifying the characteristics of reserve strengthening as it is understood by actuaries in the PC industry. With respect to the reporting requirements for life insurance companies, the NAIC annual statement similarly does not specifically define reserve strengthening, yet respondent acknowledges that the term does have a commonly understood industry definition in the life area.[15]

We are convinced that reserve strengthening concepts are as applicable to PC companies as life companies, although the need for reserve strengthening seems to occur with more frequency with respect to life insurance reserves. Although Federal tax literature seems to contain more references to reserve strengthening in association with life companies, no specific distinction between life and casualty companies regarding reserves is evident.[16] More specifically, the concept of reserve strengthening would have the same meaning in the context of PC and life business. So, for example, reserve strengthening in the context of life companies would not be more broadly or narrowly construed than it would in the context of PC companies. Accordingly, in enacting TRA 86 section 1023, Congress could not have expected a different quantitative or qualitative meaning for the term "reserve strengthening", depending upon whether it was used in connection with tax provisions specifically designed for life or PC companies. The fact that the same terminology was used as was employed in similar legislation 2 years earlier in the same subchapter of the Code creates the presumption that no change in meaning was intended. *Zuanich v. Commissioner*, 77 T.C. 428, 443 n.26 (1981) (quoting Dickerson, Interpretation and Application of Statutes 224 (1975)).

---

[15] The Supreme Court in *Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148 (1977), indicated that the accounting system approved by the National Association of Insurance Commissioners (NAIC) provides guidance for courts in considering problems that relate to the income taxation of insurance companies. The NAIC approved accounting system recognizes the difference between routine adjustments to reserves and extraordinary increases or decreases resulting from a change in the underlying assumptions.

[16] For example, in Rev. Rul. 65–240, 1965–2 C.B. 236, a casualty insurance company, writing life as well as casualty insurance, changed the basis of computing reserves on its guaranteed renewable health policies from the preliminary term basis to the net level premium basis. Although there was no indication that casualty insurance reserves were involved, respondent ruled that increases or decreases attributable to this basis change represented reserve strengthening or weakening. The fact that the taxpayer was a casualty company did not affect its ability to engage in reserve strengthening or weakening.

Respondent contends that the explanation of reserve strengthening found in the legislative history for TRA 86 is controlling and that all additions to petitioner's 1986 reserves constitute reserve strengthening.[17] Although support for respondent's interpretation and the regulatory definition of the term can be found in the legislative history, the legislative history provides no persuasive rationale for interpreting the statutory term "reserve strengthening" in a manner different from industry usage. Congress used a technical term in a specialized portion of the Internal Revenue Code. Had Congress intended to exclude any addition to the reserves from the application of the fresh-start provisions as respondent contends, the statute could have included that language. Instead, the statute contains a term of art used in an unconditional manner. Had Congress used such plain language as "all additions" or "all increases", we would agree with respondent and attribute the everyday plain meaning to those words. See *Commissioner v. Soliman,* 506 U.S. ____, 113 S. Ct. 701 (1993); *Hanover Bank v. Commissioner,* 369 U.S. 672 (1962); *Crane v. Commissioner,* 331 U.S. 1 (1947). The provisions of subpart L have been drafted by Congress in language peculiar to the insurance industry and have been held to have the meaning generally attributed thereto by experts in that industry. *Alinco Life Ins. Co. v. United States,* 178 Ct. Cl. 813, 373 F.2d 336, 352 (1967).[18]

Petitioner's contention that reserve strengthening does not apply to all increases to its reserves comports with the rationale contained in the congressional history and apparent

[17] While respondent agrees that petitioner's 1986 unpaid loss reserve estimates and increases included therein were fair and reasonable estimates within the meaning of sec. 1.832–4(b), Income Tax Regs., respondent asserts that petitioner's allegations regarding its methods for determining reserves and its motivations in making those determinations is irrelevant.

[18] The U.S. Court of Claims (quoting Justice Frankfurter's article "Some Reflections on the Reading of Statutes", 47 Colum. L. Rev. 527, 536–537 (1947)) noted in *Alinco Life Ins. Co. v. United States,* 178 Ct. Cl. 813, 373 F.2d 336, 352 (1967):

If a statute is written for ordinary folk, it would be arbitrary not to assume that Congress intended its words to be read with the minds of ordinary men. If they are addressed to specialists, they must be read by judges with the minds of specialists.

*       *       *       *       *       *       *

Words of art bring their art with them. They bear the meaning of their habitat whether it be a phrase of technical significance in the scientific or business world, or whether it be loaded with the recondite connotations of feudalism. * * * The peculiar idiom of business or of administrative practice often modifies the meaning that ordinary speech assigns to language. And if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.

purpose of the statute,[19] but not with the regulatory definition.[20] It appears that Congress intended to permit PC companies a fresh start for normal reserve increases (ones which are not artificial in nature) for the designated period. By excluding reserve strengthening from the fresh-start relief, Congress intended to prevent PC companies from inflating the amounts which would be afforded the special treatment. This conceptually intermeshes with the legislative history reference to "artificial" reserve increases. This is so because reserve strengthening is essentially an artificial (nonperiodic) change in the assumptions and/or methodology used to compute the reserves. Generally, such changes in assumptions or methodology result in a material change in the reserve's level and may affect the adequacy of the total reserve.

Respondent contends that the exclusions from the fresh-start provisions are not restricted to artificial increases in reserves. However, as previously noted, the conference agreement expressly states that the purpose of denying the fresh start for amounts attributable to reserve strengthening was to prevent taxpayers from abusing the provision by "artificially increasing the amount of income forgiven under the fresh start".

Conceptually, section 1.846–3(c), Income Tax Regs., accomplishes the computation of additions to reserves by comparing two specific points in time—the yearends of 1985 and 1986. That computational approach looks back to see what the additions to the reserves were, rather than analyzing whether the reserves were adequate. Conceptually, the proc-

---

[19] The stated purpose of the fresh-start adjustment contained in the conference agreement reads as follows:

This provision is intended to prevent taxpayers from artificially increasing the amount of income that is forgiven under the fresh start provision. [H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) 1, 367.]

[20] It should be noted that the joint committee staff stated that

Reserve strengthening does not include amounts reported to the insurance company from mandatory state or Federal assigned risk pools, if the amount of the loss reported is not discretionary with the insurance company. [Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 618 (J. Comm. Print 1987).]

Respondent concedes, solely for purposes of this case, that such additions to petitioner's reserves would not be excluded from the fresh start as being reserve strengthening. Respondent does not otherwise concede that there should be any exception to the regulations' broad definition of additions to the reserves which should not be part of the fresh start provisions. The joint committee staff's exception, however, does comport with the principle that such amounts are not artificial and would not be defined, by industry standards, as reserve strengthening.

ess of reserve strengthening considers the assumptions or methodology and employs changes to increase the reserve from what it would have been had the underlying assumptions or methodology remained unchanged. The additions made by petitioner for the critical period under the regulation were routine adjustments to the reserves based upon past reserving practices. There were no increases to the reserves for the period in question attributable to changes in assumptions or methodology in computing the reserves or additions thereto.

Having analyzed the concepts concerning reserve strengthening, we proceed to consider the validity of the regulation section in controversy.

*Validity of Section 1.846–3(c), Income Tax Regs.*

Regulations may be either legislative or interpretative in character. *Estate of Pullin v. Commissioner,* 84 T.C. 789, 795 (1985). An interpretative regulation is issued under the general authority vested in the Secretary by section 7805, whereas a legislative regulation is issued pursuant to a specific congressional delegation to the Secretary. Unlike TRA 86 section 1023(c), which added section 846 to the Code, TRA 86 section 1023(e), which contains the fresh-start provision, does not specifically delegate regulatory authority to the Secretary. Section 846(g) contains express legislative regulation authority, but it is limited to carrying out the purposes of section 846. The challenged regulation, which is an attempt to carry out the purpose of the fresh-start provisions of section 1023(e), is not a part of section 846 but is a separate transitional provision and is accordingly interpretative.[21]

An interpretative regulation, while entitled to deference, is not entitled to as much deference as accorded a legislative regulation. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982). Moreover, the standard of deference accorded an interpretative regulation only sets "the framework for judicial analysis; it does not displace it." *United States v. Cartwright,* 411 U.S. 546, 550 (1973).

A regulation may not contradict the unambiguous language of a statute. *Citizen's Natl. Bank v. United States,* 417

---

[21] Even if sec. 1.846–3(c), Income Tax Regs., was a legislative regulation, the standard for review of legislative regulations would not have caused a difference in the outcome here.

F.2d 675 (5th Cir. 1969); *Hefti v. Commissioner,* 97 T.C. 180, 189 (1991), affd. 983 F.2d 868 (8th Cir. 1993). Even if a regulation does not directly contradict or limit the language of the statute it purports to interpret, the regulation may still be invalid if it is fundamentally at odds with or inconsistent with the statute's origin and purpose. *United States v. Vogel Fertilizer Co., supra* at 26; *CWT Farms, Inc. v. Commissioner,* 79 T.C. 1054, 1062 (1982), affd. 755 F.2d 790 (11th Cir. 1985). Unless an interpretative regulation is unreasonable and plainly inconsistent with the statute, it should be sustained. *Bingler v. Johnson,* 394 U.S. 741, 750 (1969).

In determining legislative intent the Supreme Court in *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 98–99 (1991), stated:

The best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President. Where that contains a phrase that is unambiguous—that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process. * * * [Citations omitted.]

Petitioner urges that the regulation's mechanical test to define and determine reserve strengthening premised on respondent's interpretation of language contained in the conference committee report should be rejected. Petitioner contends that respondent's reliance on the reference to "all additions to reserves" in the legislative history to support her position that the statute requires a mechanical test is contrary to: (1) The description of reserve strengthening in the Senate Finance Committee report,[22] (2) the statement of legislative purpose in the conference committee report, and (3) the meaning of reserve strengthening in the parallel fresh-start transition rule of DEFRA section 216(b). In addition, petitioner asserts that respondent's approach leads to

---

[22] The Senate Finance Committee report to which petitioner refers provides in pertinent part:

Such fresh start adjustment is to be taken into account in full in the first taxable year to which the discounting provisions apply (i.e., the first taxable year beginning after December 31, 1986), for purposes of calculating any adjustments to earnings and profits. Any reserve strengthening after March 1, 1986, is to be treated as reserve strengthening for the first taxable year beginning after December 31, 1986. *The committee intends that any adjustments to reserves that are attributable to changes in reserves on account of changes in the basis for computing reserves (i.e., reserve strengthening or reserve weakening)* in a taxable year beginning before January 1, 1987, are not taken into account in determining taxable income after the effective date. [S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1, 510; emphasis supplied.]

"manifestly absurd results" that were not intended by Congress.[23]

Respondent maintains that the regulation's mechanical test for determining whether strengthening occurred satisfies congressional intent. Under the test articulated in *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837 (1984), the first question a court must ask when reviewing an agency's construction of a statute is whether Congress has directly spoken to the precise question at issue and has expressed a clear intent as to its resolution. This examination should begin with the language of the statute. *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980); *Abourezk v. Reagan,* 785 F.2d 1043, 1053 (D.C. Cir. 1986). The statute in issue, TRA 86 section 1023(e)(3), simply uses the term "reserve strengthening". There is the strong presumption that Congress expresses its intention through the language it chooses. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 432 n.12 (1987). In employing the traditional tools of statutory construction, a court should assume that Congress uses language in a consistent manner, unless otherwise indicated. *United States v. Olympic Radio & Television, Inc.,* 349 U.S. 232, 235–236 (1955).[24]

In enacting the fresh-start provision of DEFRA, Congress used an industry term of art in a manner consistent with its traditional definition. The provisions of subpart L have been drafted by Congress in language peculiar to the insurance industry and therefore are intended to have the meaning generally attributed thereto by experts in that industry. *Alinco Life Ins. Co. v. United States,* 178 Ct. Cl. 813, 373 F.2d 336, 352 (1967). There is no reason to conclude that the

---

[23] Pursuant to sec. 1.846–3(c)(3)(i), Income Tax Regs., to determine whether reserves have been strengthened from a company's yearend 1985 reserves to its yearend 1986 reserves, losses paid during 1986 are subtracted from the yearend 1985 reserves. Under the regulation's test, a reserve strengthening is an amount added to an unpaid loss reserve. This test is applied separately to each unpaid loss reserve. As noted by one commentator,

because the test is applied to each unpaid loss reserve, rather than to each separate loss, the test does not take into account the fact that a particular loss payment may exceed, or be less than, the initial estimates of the amount of the loss for which the payment was made. This may result in a failure to include, or an erroneous inclusion of, certain amounts in the computation of reserve strengthening of a particular reserve. [12 Mertens, Law of Federal Income Taxation, sec. 44.14, at 16 (Supp. 1993).]

[24] In that case, the Supreme Court concluded that for purposes of sec. 122(d)(6) it would be unfaithful to the statutory scheme to attribute a different meaning to the term "paid or accrued" than it has in other parts of the same chapter of the Internal Revenue Code.

use in TRA 86 of the term "reserve strengthening" was other than as a word of art.

As stated in *Abourezk v. Reagan, supra* at 1054–1055 n.11, it is:

plainly wrong as a general matter, and in this case in particular, to regard committee reports as drafted more meticulously and as reflecting the congressional will more accurately than the statutory text itself. Committee Reports, we remind, do not embody the law. Congress, as Judge Scalia recently noted, votes on the statutory words, not on different expressions packaged in committee reports. *Hirschey v. FERC,* 777 F.2d 1, 7–8 & n.1 (D.C. Cir. 1985) (Scalia, J., concurring).

In order to adopt respondent's regulatory use of the term "reserve strengthening", we would have to redefine an insurance concept so as to reach a definition different from its established industry meaning. Considering the record in this case, we are unable to accept respondent's regulatory definition. The statute here is neither silent nor ambiguous with respect to the specific issue in question. Reserve strengthening is a term that was adopted from the insurance industry and certain legal sources, and nothing in the statute rebuts the strong presumption that in expressing its will Congress intended the term to have any other meaning. Although we recognize that the legislative history contains contradictory explanations and to some extent supports respondent's regulatory position, we conclude that Congress intended the term as it appears in the statute to be interpreted in a manner consistent with industry usage.[25] By excluding reserve strengthening, as technically defined, Congress intended to limit PC companies' ability to obtain an advantage by artificially changing their prior reserving practices and artificially increasing 1986 yearend reserves over what they would have been. Congress knew that the new discounting rules of section 846 would cause a one-time distortion in taxable income and intended a fresh start as a remedy.

We have reached the conclusion that section 1.846–3(c), Income Tax Regs., is invalid to the extent the term "reserve strengthening" has been inappropriately used, after weighing the following factors: (1) The statute is not ambiguous and uses a term of art in a portion of the Internal Revenue Code

[25] This is not the type of situation which has generated the continuing debate on the amount of deference that should be afforded to the legislative history. This case presents a different perspective because the statute is neither ambiguous nor imprecise.

which has been specially designed for a particular industry and generally contains industry jargon; (2) the legislative history materials are internally contradictory in that there are references to all increases to reserves and explanations regarding artificial increases or a specific type of increase; (3) the regulatory definition of the term "reserve strengthening" does not comport with insurance industry usage; (4) the regulatory definition of the term "reserve strengthening" does not harmonize with its congressional use 2 years earlier in related and parallel statutes involving life, rather than PC, insurance companies; (5) the regulatory approach would result in anomalous results; and (6) the traditional industry definition of the term comports with the concept that Congress was attempting to limit any attempts by taxpayers to take advantage of the fresh-start provisions by means of artificial increases to reserves. Further, it appears that promulgation of the regulation was to some extent driven by concerns for administrative convenience and compliance.[26] It should also be noted that section 1.846–3, Income Tax Regs., is a transitional rule applicable to a single taxable year—a year for which the normal 3-year period of assessment had expired. Sec. 6501(a). Additionally, the regulation was not approved until August 1992 and did not appear in the Federal Register until September of that year, some 5 years after the close of the taxable year, a time when most if not all affected taxpayers should have already filed returns. Accordingly, administrative convenience and compliance concerns, at this juncture, should not have much bearing on the outcome.

We accordingly hold that section 1.846–3(c), Income Tax Regs., is invalid to the extent that it defines all additions to reserves as reserve strengthening.

---

[26] On brief respondent denies that administrative burdens and compliance-related concerns are the cornerstone of her argument and asserts that the regulation's validity rests in the reasonableness with which it has provided a meaning to a term which is used but not defined in the statute. However, in the Notice of Proposed Rulemaking, 56 Fed. Reg. 20162 (May 2, 1991), the acknowledged limitations of the mechanical test adopted were justified as follows:

Because the test is applied to each unpaid loss reserve, rather than to each separate loss, the test does not take into account the fact that a particular loss payment may exceed, or be less than, the initial estimate of the amount of the loss for which payment was made. This may result in a failure to include, or an erroneous inclusion of, certain amounts in the computation of reserve strengthening for a particular reserve. For most unpaid loss reserves, however, any potential inaccuracies are likely to offset each other in the aggregate. *Further, the absence of total accuracy is justified by the reduction in compliance and administrative burdens.* [Emphasis supplied.]

To reflect the foregoing and due to agreements between the parties,

*Decision will be entered for petitioner.*

Reviewed by the Court.

HAMBLEN, PARKER, SHIELDS, CLAPP, SWIFT, JACOBS, WRIGHT, PARR, COLVIN, CHIECHI, and LARO, *JJ.,* agree with this majority opinion.

CHABOT, *J.,* concurs in the result only.

---

HALPERN, *J.,* dissenting: Petitioner is a property and casualty insurance company. To reflect the fact that there is some delay between the occurrence of a covered loss and the payment of any resulting claim, petitioner maintains reserve accounts that, at yearend, approximate its expected insurance liabilities (and related expenses) for each accident year then ended. During 1986, petitioner made net additions of $1,383,383 to insurance reserves established for prior accident years. Pursuant to section 1.846–3(c), Income Tax Regs. (section 1.846–3(c)), respondent determined that such net additions constituted "reserve strengthening". As a result (and pursuant to the regulations), respondent denied petitioner any "fresh start" for the excess of such net additions to reserves over the discounted amount carried over to 1987. The majority holds section 1.846–3(c) invalid because the section contains too broad a definition of the term "reserve strengthening". The regulation implements section 1023(e)(3)(B) of the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2085, 2404 (section 1023(e)(3)(B) and the 1986 Act, respectively). The majority concludes that section 1023(e)(3)(B) unambiguously expresses Congress' intent to use the term "reserve strengthening" as a term of art, the meaning of that term being determined by its usage in the insurance industry. The regulation is too broad, says the majority, because it does not limit the term "reserve strengthening" to comport with insurance industry usage.

I dissent from the majority's opinion because (1) I do not believe that Congress unambiguously expressed its intent to adopt insurance industry usage and (2) I believe that section 1.846–3(c) *does* comport with Congress' intent as to the

meaning of the term, as that intent is expressed in the legislative history of the 1986 Act.

## I. *Construing the Statute*

The principal objective in interpreting any statute is to determine what Congress meant by the use of the statutory language being construed. *United States v. American Trucking Associations,* 310 U.S. 534, 542 (1940); *Fehlhaber v. Commissioner,* 94 T.C. 863, 865 (1990), affd. 954 F.2d 653 (11th Cir. 1992); *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989). Where the statute is ambiguous, it is well established that we may look to its legislative history and to the reason for its enactment. *United States v. American Trucking Associations, supra* at 543–544; *Centel Communications Co. v. Commissioner,* 92 T.C. 612, 627–628 (1989), affd. 920 F.2d 1335 (7th Cir. 1990); *U.S. Padding Corp. v. Commissioner, supra* at 184. If a term is used in the Code without definition and the legislative history fails to provide any insight or guidance as to the appropriate definition, the ordinary and common usage of the term is the definition that will be used in applying the provision of the Code. See *Commissioner v. Brown,* 380 U.S. 563, 570–571 (1965); *Crane v. Commissioner,* 331 U.S. 1 (1947); *Union Pac. Corp. v. Commissioner,* 91 T.C. 32, 38–40 (1988); *First Sav. & Loan Association v. Commissioner,* 40 T.C. 474, 482 (1963).

## II. *The Majority's Reasoning*

The majority assembles a number of reasons to support its conclusion that Congress used the term "reserve strengthening" as a term of art. Majority op. pp. 360–361. The principal reasons relied on by the majority are as follows: (1) The statute unambiguously uses a term that is a term of art in the insurance industry, (2) because the statute affects only the insurance industry, it is natural to construe that term as it would be used in the insurance industry, (3) the relevant committee reports are contradictory and cannot be relied on as evidence that Congress intended anything other than to use the term as a term of art, and (4) because Congress used the term as a term of art in a prior statute, that is evidence that Congress so used the term here. The majority fortifies

its reasoning (1) by stating that the regulation can cause an "anomalous" result and (2) by classifying as artificial those reserve increases that, by industry practice, constitute reserve strengthening.

I will not quibble that subchapter L concerns itself with insurance companies or that the term "reserve strengthening" is an insurance industry term of art. I disagree strongly, however, that (1) the committee reports are contradictory and cannot be relied on to support the regulation and (2) Congress' prior usage is persuasive evidence that Congress intended a term of art. Indeed, I believe that the committee reports are persuasive evidence that Congress did *not* intend a term of art. Moreover, I believe that the committee reports support the regulation. Finally, I do not find the majority's additional reasons persuasive. My reasoning is as follows.

## III. *Congress' Intent*

At issue, of course, are the words of a statute. The statute, however, offers little intelligence as to the meaning that Congress intended to attach to those words.

### A. *The Ambiguity in the Statute*

Section 1023(e)(3)(B) provides in pertinent part:

(B) Reserve Strengthening in Years After 1985.— * * * [The fresh-start rule] shall not apply to any reserve strengthening in a taxable year beginning in 1986, and such strengthening shall be treated as occurring in the taxpayer's 1st taxable year beginning after December 31, 1986.

The term "reserve strengthening" is defined neither in section 1023(e)(3)(B) nor in any other provision of the 1986 Act (or the Code). Moreover, nowhere in the 1986 Act does Congress state that the term is being used in any technical sense or as a term of art. Thus, Congress' intent that the term have a specific meaning or that Congress is using the term as a term of art is unexpressed in the language of the statute. In that sense, the statute is ambiguous.

## B. *The Structure of the Statute*

### 1. *In General*

The structure of the statute, as it relates to the fresh-start adjustment and the exception for reserve strengthening, does not indicate any technical meaning for the term "reserve strengthening". Subsections (a) through (d) of section 1023 amend the Code to provide for the discounting of unpaid losses and certain unpaid expenses. A fifth subsection, subsection (e), accomplishes three things: (1) It specifies that the amendments made by section 1023 shall apply to taxable years beginning after 1986; (2) it provides a transitional rule, and (3) it allows a fresh start, except with regard to reserve strengthening.

### 2. *The Transitional Rule*

The second accomplishment of subsection (e), the transitional rule, simply provides that the unpaid loss balances carried over from the last preceding year to the first year in which discounting is required shall be computed on a discounted basis. The effect of the transitional rule is to reduce such carryover balances by the amount of required discount. In the normal course of insurance company accounting, that reduction (1) would have flowed back into income, (2) to be deducted again as time ran (the discount shrank) or the loss was paid.

### 3. *The Fresh-Start Adjustment*

The fresh-start adjustment eliminates the first, *but not the second,* of those two consequences of the transitional rule. Thus, in effect, the fresh-start adjustment allows the same amount of expected liability (the amount of the discount) to be *twice* counted as an unpaid loss: *once,* when, prior to the required reduction of the carryover balance, it is added to unpaid losses, and, *twice,* when, thereafter, it is again added to unpaid losses or is paid.

### 4. *The Reserve Strengthening Exception*

The reserve strengthening exception eliminates what might well be thought of as a double deduction for certain amounts added to reserves for unpaid losses in years begin-

ning in 1986 (the last year before the first year of discounting). Nothing in the structure of sections (a) through (d) of section 1023 or in the effective date provisions or other provisions of section 1023(e) compels any particular reading of the term "reserve strengthening". Indeed, based on the language and structure of the statute, the only intent that Congress unambiguously expressed with respect to reserve strengthening is that any reserve strengthening that occurred in 1986 should be disqualified from a fresh start.

## C. *The Committee Reports*

### 1. *The Senate Amendment*

The loss discounting rules at issue had their origin in the Senate amendment (the Senate amendment) to a House bill, H.R. 3838, 99th Cong., 1st Sess. secs. 1021–1027 (1985). See S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1, 510. The Senate amendment had both a fresh start adjustment and a reserve strengthening exception. As enacted, the fresh start adjustment was virtually identical to the provision contained in the Senate amendment. The reserve strengthening exception, however, was quite different. The reserve strengthening exception in the Senate amendment was as follows:

> (B) Reserve Strengthening After March 1, 1986.—* * * [the fresh-start adjustment] shall not apply to any reserve strengthening reported for Federal income tax purposes after March 1, 1986, for a taxable year beginning before January 1, 1987, and such strengthening shall be treated as occurring in the taxpayer's 1st taxable year beginning after December 31, 1986. The preceding sentence shall not apply to the computation of reserves on any contract if such computation employs the reserve practice used for purposes of the most recent annual statement filed on or before March 1, 1986, for the type of contract with respect to which reserves are set up. [H.R. 3838, 99th Cong., 2d sess., as reported by the Senate Finance Committee May 9, 1986.]

The Finance Committee explained its reserve strengthening exception as follows:

> Any reserve strengthening after March 1, 1986, is to be treated as reserve strengthening for the first taxable year beginning after December 31, 1986. The committee intends that any adjustments to reserves that are attributable to changes in reserves on account of changes in the basis for computing reserves (i.e., reserve strengthening or reserve weakening) in a taxable year beginning before January 1, 1987, are not taken into account

in determining taxable income after the effective date. [S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1, 510.]

## 2. *The Conference Agreement*

The differences between the House- and Senate-passed versions of H.R. 3838 were reconciled by a Committee of Conference (the conference committee). The agreements reached by the conference committee became law as the 1986 Act. With regard to reserve strengthening, the agreement reached by the conference committee (the conference agreement) differs from the Senate amendment in two significant respects: It applies to reserve strengthening for *all* of any taxable year beginning in 1986 (rather than just for periods beginning after March 1, 1986), and it eliminates any discussion of reserve computations to which it does or does not apply. The conference agreement is as follows:

(B) Reserve Strengthening In Years After 1985.—Subparagraph (A) [the fresh-start provision] shall not apply to any reserve strengthening in a taxable year beginning in 1986, and such strengthening shall be treated as occurring in the taxpayer's 1st taxable year beginning after December 31, 1986. [H. Conf. Rept. 99-841 (Vol. I), at I–338 (1986).]

The conference committee modified, *and knew it was modifying,* the Senate amendment. The conference explanation with regard to the fresh-start adjustment is as follows:

*Fresh start adjustment*

The conference agreement follows the Senate amendment with respect to providing a fresh start adjustment—i.e., a forgiveness of income—for the reduction in reserves resulting from discounting the opening reserves in the first post-effective date taxable year of the provision. *The conference agreement modifies the Senate amendment with respect to the treatment of reserve strengthening under the fresh start income forgiveness provision.* Under the conference agreement, reserve strengthening in taxable years beginning after December 31, 1985, is not treated as a reserve amount for purposes of determining the amount of the fresh start. Instead, such reserve strengthening additions to loss reserves in taxable years beginning in 1986 are treated as changes to reserves in taxable years beginning in 1987, and are subject to discounting. Reserve strengthening is considered to include all additions to reserves attributable to an increase in an estimate of a reserve established for a prior accident year (taking into account claims paid with respect to that accident year), and all additions to reserves resulting from a change in the assumptions (other than changes in assumed interest rates applicable to reserves for the 1986 accident year)

used in estimating losses for the 1986 accident year, as well as all unspecified or unallocated additions to loss reserves. This provision is intended to prevent taxpayers from artificially increasing the amount of income that is forgiven under the fresh start provision. [H. Conf. Rept. 99–841 (Vol. II) (1986), 1986–3 C.B. (Vol. 4) 1, 367; emphasis added.]

### 3. *What Is To Be Made of the Committee Reports?*

The majority finds support for section 1.846–3(c) in the committee reports. Majority op. p. 355. Nevertheless, the majority judges that support to be weak, because it sees the committee reports to be in conflict. Majority op. pp. 350, 360. The majority ignores the evolution of the reserve strengthening provision as it passed from the Senate through the conference committee. Taking that evolution into consideration, I accord the conference explanation significantly greater weight than does the majority.

Moreover, we are not here faced simply with picking the better of two conflicting explanations of the same provision. The committees were dealing with substantially different provisions, and that must be taken into account in weighing any differences between the reports. The conference agreement became law. The conference explanation, I believe, presents strong evidence that Congress did *not* intend a wholesale adoption of industry usage. The conference committee carefully set out what it considered to be included within the meaning of the term "reserve strengthening". While that is not necessarily inconsistent with the committee limiting the meaning of the term to industry usage, a more convincing explanation is that the committee had in mind something in place of (or at least in addition to) industry usage. Indeed, the majority seems to concede that much. Majority op. p. 350 ("in the promulgation of the regulation, there was reliance upon a possible explanation of the term in the legislative history which is substantially different from and broader than the customary industry usage.")

D. *Prior Usage*

1. *The Majority's Position*

The Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98–369, 98 Stat. 494, significantly changed the way that companies that sell life insurance compute reserves for Federal income tax purposes. DEFRA secs. 201–231, 98 Stat. 719–777. Those provisions contain a fresh-start adjustment and a reserve strengthening exception. DEFRA sec. 216, 98 Stat. 758. The majority makes the following two points with regard to those provisions:

(1) "[I]t is clear that the term ["reserve strengthening"] was used in its technical industry parlance." Majority op. p. 350.

(2) "The fact that the same terminology was used as was employed in similar legislation 2 years earlier in the same subchapter of the Code creates the presumption that no change in meaning was intended." Majority op. p. 354.

I am unconvinced of the first point, and question the consequence of the second.

2. *DEFRA Section 216(b)(3)*

In pertinent part, DEFRA section 216(b)(3), 98 Stat. 759, (section 216(b)(3)) provides as follows:

(3) Reinsurance transactions, and reserve strengthening, after September 27, 1983.—

(A) In general.—Paragraph (1) [general rule for fresh start adjustment] shall not apply * * *

\* \* \* \* \* \* \*

(ii) to any reserve strengthening reported for Federal income tax purposes after September 27, 1983, for a taxable year ending before January 1, 1984.

Clause (ii) shall not apply to the computation of reserves on any contract issued if such computation employs the reserve practice used for purposes of the most recent annual statement filed before September 27, 1983, for the type of contract with respect to which such reserves are set up.

Section 216(b)(3) is explained in the accompanying report of the Finance Committee as follows:

Also, the "fresh start" rule does not apply to any reserve strengthening reported for Federal income tax purposes after September 27, 1983, for a taxable year ending before January 1, 1984. For these purposes, the

phrase "any reserve strengthening" includes the computation of reserves on contracts issued in 1983, under plans of insurance in existence on September 27, 1983, on a more conservative basis than was the customary practice of the company for similar contracts, or to the strengthening of reserves for tax purposes, generally, on existing business. * * * [S. Print 98–169 (Vol. I), at 568 (1984)].

See H. Conf. Rept. 98–861 (1984), 1984–3 C.B. (Vol. 2) 1, 325–326 (Senate definition of reserve strengthening adopted).

### 3. *How Was the Term Used in the 1984 Act?*

Contrary to the majority's first assertion, it is *not* clear from either DEFRA section 216(b)(3) or the report of the Finance Committee that Congress was using the term "reserve strengthening" "in its technical industry parlance." That assumption by the majority appears to be based on no more than the majority's perception that there is a lack of evidence to the contrary. However, both the sentence following clause (ii) in section 216(b)(3) and the report of the Finance Committee appear to contemplate that, for purposes of section 216(b)(3), reserve strengthening includes certain computations of reserves on contracts issued in 1983. That seems to contradict the majority's belief that reserve strengthening is confined to changes in reserves first held before the current year: "the term 'reserve strengthening' is confined to a change in the basis for calculating the current reserve for claims incurred in a previous period (for which a reserve computed on a different basis had been held prior to the current period)." Majority op. p. 352. If, indeed, the 1984 provision and legislative history do contradict the majority's belief as to the term "reserve strengthening", then the majority has failed to explain how those interpretative materials are not evidence that Congress intended something other than to adopt an industry usage.

### 4. *A Presumption Rebutted*

According to the authority cited by the majority, the presumption that no change in meaning was intended is called the "'rebuttable presumption of formal consistency'". *Zuanich v. Commissioner,* 77 T.C. 428, 443 n.26 (1981) (quoting Dickerson, Interpretation and Application of Statutes 224 (1975)). As with many evidentiary presumptions, however, evidence to the contrary eliminates the dispositive authority

of the presumption. See, e.g., Lilly, Introduction to the Law of Evidence, secs. 3.2–3.4 (2d ed. 1987) (*"Once the basic facts* [that set up the presumption] *are believed,* the resulting presumed fact must be accepted by the trier *unless* it is rebutted by contravening evidence."). Moreover, the rebuttable presumption of formal consistency is not even an evidentiary presumption; it is nothing more than a tool to be used in construing statutes. "[R]ules of construction are not in any true sense rules of law. So far as valid, they are what Mr. Justice Holmes called them, axioms of experience." Frankfurter, "Some Reflections on the Reading of Statutes", 47 Colum. L. Rev. 527, 544 (1947). Thus, the interpretative value of the rebuttable presumption of formal consistency largely depends upon the particulars of each individual case. Contradictory evidence will curtail, or even eliminate, the force of that presumption. There is such evidence here, which not only eliminates the force of the presumption, but which is, I think, dispositive to the contrary.

Although it is true that the words "reserve strengthening" appear in both section 216(b)(3) of the 1984 Act and section 1023(e)(3)(B) of the 1986 Act, the two provisions are otherwise significantly different. Section 1023(e)(3)(B) does not contain a limitation excluding from the term "reserve strengthening" certain computations of reserves employing past practices. A similar limitation *did* appear in the Senate amendment (in connection with the 1986 Act), and I think it fair to assume that the Senate amendment was modeled on section 216(b)(3). That limitation, however, was dropped by the conference committee. Moreover, the conference committee stated that it was modifying the Senate amendment with respect to reserve strengthening. See *infra.* That raises the question, of course, of the intended scope of the modifications. That would seem a question for this Court. There is, thus, evidence to rebut the presumption. I believe that the presumption has lost its force. Indeed, on the evidence before us, it would be difficult to conclude that Congress did not have something of a different meaning in mind.

E. *Anomalous Results*

Petitioner hypothesizes that, in certain situations, the application of section 1.846–3(c) would lead to "absurd" or "manifestly absurd" results, unintended by Congress. Major-

ity op. pp. 349 n.8, 358–359. The majority describes section 1.846–3(c) as causing "anomalous results", and cites those results in support of its conclusion that the regulation is invalid. Majority op. pp. 360–361. As far as I can tell, however, the results that petitioner characterizes as absurd and the majority characterizes as anomalous are only the following: With regard to additions to reserves subject to the regulation (i.e., reserve strengthening), a taxpayer can deduct the required discount no more than once in computing its deductions for losses incurred. While it is true that the effect of discounting is to delay, in part, the deduction for such additions to reserves, that delay is no more than a matter of timing. A taxpayer is entitled to deduct no less than the full amount of the increase in reserves for any claim. The anomaly taken account of by the majority is the lack of an advantage (which certainly may be viewed as a disadvantage), but it is not a manifestly absurd result, as petitioner's example would suggest. Congress clearly intended to prohibit an advantage in some cases, and the only question is where it drew the line.

## F. *Artificial Increases*

### 1. *The Majority's Position*

The conference explanation evidences Congress' concern with preventing artificial increases in the amount of income forgiven under the fresh start adjustment: "This provision is intended to prevent taxpayers from artificially increasing the amount of income that is forgiven under the fresh start provision." H. Conf. Rept. 99–841 (1986), 1986–3 C.B. (Vol. 4) 1, 367. The majority recognizes that and equates artificial increases with reserve strengthening (as the industry defines it) but not with other additions to reserves. Majority op. p. 356.[1] I do not find the majority's distinction persuasive.

---

[1] The majority states, majority op. pp 347–348:

It is important to note that respondent agrees that petitioner's additions to its reserves were reasonable and that the reserves were determined in accord with petitioner's prior practices and procedures. * * * Respondent does not question whether petitioner's reserve additions would represent reserve strengthening by reference to the definition advanced by petitioner. *Due to respondent's concession in this case, we do not have to address the question of whether petitioner attempted to "artificially" increase its reserve to take advantage of the fresh-start provisions.* [Fn. ref. omitted; emphasis added.]

It is unclear precisely what concession the majority is referring to: (1) That petitioner's additions to reserve were reasonable and determined in accord with prior practices and procedures or (2)

## 2. *Artificial Increases*

The conference explanation does not say in what sense the word "artificial" is being used. Common dictionary definitions involve mostly the distinction between man-made and natural objects or phenomena. E.g., Webster's Ninth New Collegiate Dictionary (1985). That usage seems inappropriate with regard to reserves, which, after all, are estimates of liabilities: "'best estimates' of future settlement costs." Salzmann, Estimated Liabilities For Losses & Loss Adjustment Expenses 155 (1984) (majority op. pp. 350–351 n.9). It is difficult to conceive of an estimate being man-made as opposed to natural. A less common definition of the word "artificial" is: "artful" or "cunning". Webster's Ninth New Collegiate Dictionary (1985). Apparently, that is the sense that the conference committee had in mind.

## 3. *Normal Additions and Reserve Strengthening*

The majority distinguishes between (1) normal additions to an insurance company's reserves made each year to fund existing and increasing obligations under policies in force and (2) additions required when a method or assumption used in calculating policy reserves is changed so as to produce higher reserves. Majority op. p. 351. Such latter additions the majority accepts as reserve strengthening ("the term 'reserve strengthening' is confined to a change in the basis for calculating the current reserve for claims incurred in a previous period (for which a reserve computed on a different basis had been held prior to the current period).").
Majority op. p. 352 (fn. ref. omitted). The majority cites an insurance authority (Carter, "Capital and Surplus Accounts", in Insurance Accounting and Statistical Association, Life Insurance Accounting 147, 163 (Strain ed. 1977)) to explain the reason for the distinction:

---

that such additions did not constitute reserve strengthening within industry usage. Apparently, it is the first. See majority op. p. 348 n.6. Since the majority determines that, for purposes of judging the validity of sec. 1.846–3(c), artificial reserve increases involve nonperiodic changes in the assumptions or methodology used in computing reserves, see majority op. p. 356, the importance of the concession to the question of validity is unclear. First, respondent has certainly not conceded the majority's definition that artificial reserve increases involve only nonperiodic changes in reserve assumptions or methodology. Second, neither has respondent conceded that validity turns on whether the regulation distinguishes between good and bad faith additions to reserves. What is missing from the majority's analysis is the link between respondent's concession and the issue in this case.

The ordinary increases in reserves during each year are charged to net gain from operation. It would be inappropriate, however [from a financial analysis point of view], to include in this annual charge the one-time, extraordinary increase due to reserve strengthening, so the latter increase is charged instead directly to surplus. * * * [Majority op. p. 352 n.11.]

## 4. *Cannot Normal Additions to Reserves Be Artificial?*

The majority goes on to state: (1) "Congress intended to permit PC companies a fresh start for normal reserve increases (ones which are not artificial in nature) for the designated period.", and (2) "reserve strengthening is essentially an artificial (nonperiodic) change in the assumptions and/or methodology used to compute the reserves." Majority op. p. 356. The majority equates artificiality with irregularity, or nonperiodicity. I assume that the majority's concern is that, being irregular in occurrence, reserve strengthening is subject to manipulation as to timing, while "normal" additions to reserves, being periodic, are not (since they will occur anyway). That may well be true, but it does not mean that normal additions cannot be inflated for the purpose of taking advantage of the fresh start adjustment. Indeed, the normal additions in this case are described by the majority as, at least with regard to incurred but not reported (IBNR) reserves, being dependent on the judgment of George Klouda, taxpayer's president and general manager, that, based on emerging claims experience as against previous IBNR reserves, existing IBNR reserves were inadequate. Majority op. p. 341. It may not have happened here, but the majority has not convinced me that such additions are immune from a "finger-in-the-wind" analysis that would be artificial, as Congress used that term. Simply put, I am not convinced that only nonperiodic reserve additions (reserve strengthening, in industry terms) are subject to the abuse that Congress was concerned with, and labeled artificial.

## G. *What Congress Had in Mind*

The term "reserve strengthening" is not defined in the statute. Within the insurance industry, however, it apparently is something of a term of art.[2] The majority grasps hold

---

[2] To this point in my analysis, I have not questioned that the term "reserve strengthening" is an insurance industry term of art. I *have* questioned whether Congress intended to be bound by a term of art, and have concluded that it did not. Even if Congress did intend to be bound by a term of art, however, I am not persuaded by the majority that sec. 1.846–3(c), Income Tax

of that fact because it can find no persuasive rationale for interpreting the term "reserve strengthening" differently. Majority op. p. 355. Respectfully, I suggest that the majority has misread the pertinent legislative history. There is no support for the majority's position where the majority finds support (in DEFRA), and the conference explanation weakens the majority's position much more than the majority concedes. On balance, I think that the conclusion to be drawn from the conference explanation is that, in adopting the conference agreement, Congress had in mind something in place

Regs. (sec. 1.846–3(c)) is invalid. The regulation would only be invalid if it did not constitute a reasonable interpretation of that term of art. Cf. *Pepcol Manufacturing Co. v. Commissioner*, 13 F.3d 355 (10th Cir. 1993), revg. 98 T.C. 127 (1992) (concept of recycling in the regulations not unreasonable or plainly inconsistent with Congress' intent in providing a tax credit for certain "recycling equipment"). I am not persuaded by the majority because the majority has not shown that, as a term of art, the term "reserve strengthening" is sufficiently unambiguous that it is necessarily contradicted by sec. 1.846–3(c).

My concern is justified by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984). Under *Chevron,* the first inquiry to be made by a court when it reviews an agency's construction of a statute is whether Congress has directly spoken to the precise question at issue. "[F]or the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–843. If Congress has not spoken to the precise question, then respondent's regulation must be upheld if it is a permissible construction of the statute under the second inquiry in the *Chevron* analysis. I believe that the precise question here is the meaning of the term "reserve strengthening". Further, I believe that all that the majority has shown is that, at best, Congress has unambiguously settled on an imprecise meaning.

The majority states: "In order to adopt respondent's regulatory use of the term 'reserve strengthening', we would need to redefine an insurance concept so as to reach a definition different from its established industry meaning." Majority op. 360. The inference is that the term has a sufficiently precise industry meaning, so that it can be determined that the regulatory definition is incompatible with that meaning. The majority, however, is unable to provide a specific definition for "reserve strengthening" as that term presumably is used in connection with property and casualty companies. Admittedly, the majority does assert that adjustments of reserves that result from a change in the basis for computing reserves fall within the definition of "reserve strengthening." Majority op. p. 352. Beyond that statement, however, all that the majority can say is that there are certain "reserve strengthening concepts" and that respondent's regulation is inconsistent with those concepts. The majority does not explain precisely how respondent's regulation differs from those concepts.

For a life insurance company, the basis for computing reserves principally involves three assumptions: (1) The number of lives, (2) mortality rates, and (3) interest rates. At least the first two seem subject to accurate prediction. For a property and casualty company, on the other hand, insuring against, say, the risks of hurricane damage, the basic assumptions may involve less prediction and more guesswork. Changes in the basis for computing reserves may be more common and, thus, less important. Reserve strengthening may not be a developed concept.

Beyond pointing to the "reserve strengthening concepts", the majority is unable to come up with any accepted definition in the property and casualty insurance company context. I fail to see how the majority's holding that Congress intended to use a term of art can meet the "unambiguously expressed intent of Congress" test under the *Chevron* analysis, where, as here, that term is defined simply as "reserve strengthening concepts" and is not given any concrete meaning in the context in which this case arose (i.e., property and casualty insurance company reserve practices). Thus, based upon the majority's analysis, I must disagree with the assertion that "the statute is neither ambiguous nor imprecise." Majority op. p. 360 n.25. Indeed, using the various tools of construction and interpretative materials as they have been employed by the majority, I find it difficult to conclude otherwise than that the statute is ambiguous and imprecise with respect to the "precise question at issue" in this case.

of (or at least in addition to) industry usage. The only question left, then, is whether section 1.846–3(c) conflicts with what Congress had in mind (and expressed in the conference explanation). I do not believe that it does.

IV. *Validity of Section 1.846–3(c)*

A. *Governing Propositions*

The majority has nicely set forth those propositions that must govern our evaluation of section 1.846–3(c). Majority op. pp. 357–358. They are:

(1) A regulation may not contradict the unambiguous language of a statute. *Citizen's National Bank of Waco v. United States,* 417 F.2d 675, 679–680 (5th Cir. 1969); *Hefti v. Commissioner,* 97 T.C. 180, 189 (1991), affd. 983 F.2d 868 (8th Cir. 1993).

(2) Even if a regulation does not directly contradict or limit the language of the statute it purports to interpret, the regulation may still be invalid if it is fundamentally at odds with or inconsistent with the statute's origin and purpose. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 26 (1982); *CWT Farms, Inc. v. Commissioner,* 79 T.C. 1054, 1062 (1982), affd. 755 F.2d 790 (11th Cir. 1985).

(3) Unless an interpretative regulation is unreasonable and plainly inconsistent with the statute, it should be sustained. *Bingler v. Johnson,* 394 U.S. 741, 750 (1969).

B. *An Ambiguous Statute*

The term "reserve strengthening" may have a common and ordinary (and perhaps unambiguous) meaning in the insurance industry. As discussed above, however, it is not clear that Congress intended that meaning for purposes of section 1023(e)(3)(B). In that sense, the statute is ambiguous. The fact that section 1.846–3(c) may define reserve strengthening in a way that departs from its common and ordinary meaning in the insurance industry does not, thus, give rise to a contradiction that, necessarily, invalidates the regulation. We must look to the origin and purpose of the statute.

## C. *Congress' Intent*

It may fairly be supposed that Congress intended the reserve strengthening exception to prevent taxpayers from taking unintended advantage of the income-exclusion consequence of the fresh-start adjustment. Indeed, the conference explanation states: "This provision is intended to prevent taxpayers from artificially increasing the amount of income that is forgiven under the fresh-start provision." H. Conf. Rept. 99–861 (1986), 1986–3 C.B. (Vol. 4) 1, 367.

The conference committee drew a line between artificial and nonartificial increases in the amount of income that is forgiven under the fresh-start provision. The implication, nonetheless, is that there are some *reserve* additions that were intended not to constitute reserve strengthening (as the committee used that term). That is so because the amount of *income* that is forgiven under the fresh-start adjustment depends on a taxpayer's unpaid losses and expenses (*reserves*) at the end of its last taxable year beginning in 1986. See sec. 1023(c)(3)(A). The conference committee did not leave us in the dark as to those reserve additions that do not constitute reserve strengthening.

In pertinent part, the conference explanation states:

Reserve strengthening is considered to include [1] all additions to reserves attributable to an increase in an estimate of a reserve established for a prior [pre-1986] accident year (taking into account claims paid with respect to that accident year), and [2] all additions to reserves resulting from a change in the assumptions (other than changes in assumed interest rates applicable to reserves for the 1986 accident year) used in estimating losses for the 1986 accident year, as well as [3] all unspecified or unallocated additions to loss reserves. * * * [H. Conf. Rept. 99–861 (1986), 1986–3 C.B. (Vol. 4) 1, 367.]

The first [1] category of additions described by the committee deals with additions to reserves for accident years before 1986; the second [2] deals with additions for 1986 accident years, and the third [3] deals with unspecified or unallocated additions. Clearly, many more additions to reserves constitute reserve strengthening than do not. No additions in the third category constitute other than reserve strengthening. In the second category, only additions resulting from a change in assumed interest rates constitute other than reserve strengthening. In the first category, only additions

*not* attributable to an increase in an estimate of a reserve constitute other than reserve strengthening.

### D. *The Regulation*

At issue here is section 1.846–3(c), Income Tax Regs., and, in particular, subparagraph (3) thereof. Subparagraph (3) deals with accident years before 1986. It contains a general rule and three exceptions.[3] The general rule is inclusive, with virtually all additions to reserves constituting reserve strengthening. The exceptions are narrow; nevertheless, they *are* exceptions. The only question is whether the general rule, as limited by the exceptions, describes a universe that corresponds to the committee's description of reserve strengthening for accident years before 1986:

all additions to reserves attributable to an increase in an estimate of a reserve established for a prior [pre-1986] accident year (taking into account claims paid with respect to that accident year) * * * [H. Conf. Rept. 99–861 (1986), 1986–3 C.B. (Vol. 4) 1, 367.]

The majority defines reserves as follows:

---

[3] Paragraph 3 of sec. 1.846–3(c) states:

(3) Accident years before 1986. (i) In general. For each taxable year beginning in 1986, the amount of reserve strengthening (weakening) for an unpaid loss reserve for an accident year before 1986 is the amount by which the reserve at the end of that taxable year exceeds (is less than)—

(A) The reserve at the end of the immediately preceding taxable year; reduced by

(B) Claims paid and loss adjustment expenses paid ("loss payments") in the taxable year beginning in 1986 with respect to losses that are attributable to the reserve. The amount by which a reserve is reduced as a result of reinsurance ceded during a taxable year beginning in 1986 is treated as a loss payment made in that taxable year.

(ii) Exceptions. Notwithstanding paragraph (c)(3)(i) of this section, the amount of reserve strengthening (weakening) for an unpaid loss reserve for an accident year before 1986 does not include—

(A) An amount added to the reserve in a taxable year beginning in 1986 as a result of a loss reported to the taxpayer from a mandatory state or federal assigned risk pool if the amount of the loss reported is not discretionary with the taxpayer; or

(B) Payments made with respect to reinsurance assumed during a taxable year beginning in 1986 or amounts added to the reserve to take into account reinsurance assumed for a line of business during a taxable year beginning in 1986, but only to the extent that the amount does not exceed the amount of a hypothetical reserve for the reinsurance assumed. The amount of the hypothetical reserve is determined using the same assumptions (other than the assumed interest rates) that were used to determine a reserve for reinsurance assumed for the line of business in a taxable year beginning in 1985.

(iii) Certain transactions deemed to be reinsurance assumed (ceded) in 1986. For purposes of this paragraph (c)(3), reinsurance assumed (ceded) in a taxable year beginning in 1985 is treated as assumed (ceded) during the succeeding taxable year if the appropriate unpaid loss reserve is not adjusted to take into account the reinsurance transaction until that succeeding taxable year.

Historically, reserves have been described in PC insurance literature as *estimated* liabilities for losses and loss adjustment expenses.[9] To some extent, loss reserves are *estimates* extrapolated from past trends, patterns, averages, and inferences and predictions as to the future. * * * [Emphasis added.]

[9] Reserves are "'best *estimates*' of future settlement costs." Salzman, Estimated Liabilities For Losses & Loss Adjustment Expenses 155 (1984). [Majority op. pp. 350–351.]

As stated, according to the conference explanation, with regard to pre-1986 accident years, only additions *not* attributable to an *increase* in an *estimate* of a reserve constitute other than reserve strengthening. Given the majority's definition of a reserve (with which I have no reason to disagree), it is difficult to imagine *any* reserve addition for a pre-1986 accident year that does *not* constitute reserve strengthening. The conference committee seems to be saying that, for a pre-1986 accident year, reserve strengthening constitutes all additions attributable to an increase in "an estimate of an estimate". What reserve additions are not included?

Section 1.846–3(c), as it applies to reserve strengthening for pre-1986 accident years, does not contradict the conference explanation by overbroadly defining reserve strengthening. If anything, by providing exceptions to the general rule of inclusion, section 1.846–3(c)(3)(ii) seems generous. If Congress' intent is evidenced by the conference explanation, then section 1.846–3(c)(3) is not fundamentally at odds with, or inconsistent with, the statute's origin and purpose.

### E. *Conclusion*

The third proposition for determining the validity of a regulation set forth above is as follows: Unless an interpretative regulation is unreasonable and plainly inconsistent with the statute, it should be sustained. *Bingler v. Johnson,* 394 U.S. 741, 750 (1969). Taking into account the conference explanation of what it (and Congress) intended to accomplish, I do not find section 1.846–3(c) to be either unreasonable or plainly inconsistent with the statute. I would sustain it.

WELLS, WHALEN, and BEGHE, *JJ.,* agree with this dissent.