105 T.C. No. 17


UNITED STATES TAX COURT


HACHETTE USA, INC., AS SUCCESSOR TO HACHETTE PUBLICATIONS, INC., AND CURTIS CIRCULATION CO., SUBSIDIARY, Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

HACHETTE USA, INC., AS SUCCESSOR TO HACHETTE DISTRIBUTION, INC., AND CURTIS CIRCULATION CO., SUBSIDIARY, Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 11693-94, 11694-94.    Filed September 25, 1995.


Ps filed their consolidated Federal income tax returns electing under sec. 458, I.R.C., to exclude from gross income the sales revenue attributable to magazines that were returned by the purchasers shortly after the close of the tax year. In computing gross income Ps originally made correlative adjustments to cost of goods sold pursuant to sec. 1.458-1(g), Income Tax Regs. Subsequently they filed amended returns recomputing gross income without the cost adjustments required by the regulation, taking the position that the regulation is invalid.

Held:  Because Congress did not intend to prescribe or preclude rules for the treatment of costs under the sec. 458, I.R.C., election, the regulation does not conflict with this section and is valid.

Daniel M. Davidson and John Wester, for petitioners.

John A. Guarnieri and Douglas A. Fendrick, for respondent.

OPINION

LARO, Judge:  These cases were consolidated for trial, briefing, and opinion, and submitted to the Court without trial pursuant to Rule 122(a).[1]  Hachette USA, Inc. (Hachette USA), and its subsidiary Curtis Circulation Co. (Curtis) petitioned the Court for redetermination of the following Federal income tax deficiencies determined by respondent:

Docket No. 11693-94:

| Taxable Year | Deficiency |
| --- | --- |
| 1987 | $665,225 |

Docket No. 11694-94:

| Taxable Year | Deficiency |
| --- | --- |
| 1987 | $139,502 |

| Tax Year Ended | Deficiency |
| --- | --- |
| Nov. 30, 1988 | $2,535,928 |

---

[1] All Rule references are to the Tax Court Rules of Practice and Procedure and, unless otherwise indicated, section references are to the Internal Revenue Code for the years at issue.

After concessions, the issues for decision are: (1) Whether section 1.458-1(g), Income Tax Regs., which requires a taxpayer to reduce cost of goods sold when it elects to exclude sales income under section 458, is invalid; and (2) even if it is invalid, whether a taxpayer must obtain the Secretary's consent under section 446(e) before recomputing its taxable income without the erroneous cost of goods sold adjustments. Because we hold that the regulation is valid, we find it unnecessary to reach the second issue.

### Stipulations by the Parties

The facts have been fully stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.[2] Petitioner Hachette USA is a Delaware corporation whose principal place of business on the date the petitions in this case were filed was in New York, New York. Petitioner Curtis was organized under Delaware law on May 28, 1986. From that time until June 30, 1987, it was a member of an affiliated group of corporations whose parent was Hachette Publications, Inc., a New York corporation (HPI). Curtis' income and deductions from May 28 through December 31, 1986, were included in the consolidated Federal income tax return, Form 1120, U.S. Corporation Income Tax Return (Form 1120), filed by HPI for HPI's 1986 taxable year. Curtis' income

---

[2] Respondent contested the relevance of petitioners' Exhibit 10. Accordingly, this exhibit is not incorporated.

and deductions for the 6-month period ended June 30, 1987, were included on Form 1120 filed by HPI for HPI's 1987 taxable year.

On June 30, 1987, HPI transferred all of its stock in Curtis to Hachette Distribution, Inc., a Delaware corporation (HDI). Curtis' income and deductions for the 6-month period ended December 31, 1987, and for the 11-month period ended November 30, 1988, were included on Forms 1120 filed by HDI for HDI's 1987 and 1988 taxable years, respectively. In a merger consummated on November 30, 1988, Hachette USA, succeeded to all the assets, claims, debts, and liabilities of HPI and HDI.

At all times relevant to these cases, Curtis was a national wholesale distributor of magazines. Its customers were local or regional distributors who sold the magazines acquired from Curtis to retail merchants. In accordance with established industry practice Curtis billed its customers for the full number of copies that it shipped to them, but granted them the legal right to receive full credit for copies of magazines that they were unable to sell. Curtis, in turn, was entitled to receive full credit from the magazine publishers for these unsold copies. Thus, the financial risk associated with returned merchandise was ultimately and solely borne by Curtis' suppliers.

In computing its income for the taxable years in issue Curtis properly elected under section 458 to exclude from gross income the full amount of the sale price of copies returned by its customers within the first 2-1/2 months of the following

taxable year. On Forms 1120 filed for HPI's 1986 and 1987 taxable years and HDI's 1987 taxable year, Curtis also reduced its cost of goods sold by the amount of the credits that it was entitled to receive and in due course did receive from the magazine publishers with respect to the returned magazines. These correlative cost adjustments were in accordance with section 1.458-1(g), Proposed Income Tax Regs., 49 Fed. Reg. 34523 (Aug. 31, 1984) (the Regulation). In early 1989 Curtis learned that the Government had conceded a refund action involving another taxpayer's attempt to make the section 458 election without offsetting cost adjustments. In reliance upon this concession, Curtis filed a Federal income tax return, Form 1120X, Amended U.S. Corporation Income Tax Return (Form 1120X), for HPI's 1986 and 1987 taxable years and HDI's 1987 taxable year covered by its section 458 election, on which it recomputed the amount of the gross income exclusion without regard to the requirements of the Regulation and claimed refunds for overpayment of tax and interest. With respect to HPI's 1987 taxable year, respondent refunded the full amount claimed, but she has not allowed the claim with respect to the HDI 1987 taxable year.

On Form 1120 for HDI's 1988 taxable year Curtis computed the exclusion for returned merchandise without offsetting adjustments for the credits it was entitled to receive from its suppliers. On April 13, 1994, respondent timely mailed notices of deficiency

to HPI and HDI.  In the notice sent to HDI respondent disallowed the claim for refund with respect to the HDI 1987 taxable year. On July 5, 1994, Hachette USA, as successor to HPI and HDI, and Curtis timely filed petitions with the Court.

All of the deficiencies and overpayments in dispute turn on the application of the Regulation to the computation of gross income under the section 458 election.  The parties agree that if Curtis was required to follow the Regulation, there are deficiencies of $665,225 for HPI's 1987 taxable year, $135,804 for HDI's 1987 taxable year, and $2,535,928 for HDI's 1988 taxable year.  If the Regulation is invalid, and Curtis was not required to secure the Secretary's consent to recompute its taxable income on the Forms 1120X, there are no deficiencies, and there is an overpayment for HDI's 1987 taxable year in the amount of $1,165,475.

<u>Legislative Background</u>

Section 458 was added to the Code by section 372(a) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2860.  The specific problems to which it was addressed are explained in the legislative history.  Under general tax principles accrual basis taxpayers must include sales revenues in income for the taxable year when all events have occurred which fix the right to receive the income and the amount of the income can be determined with reasonable accuracy.  See sec. 451(a); sec. 1.451-1(a), Income Tax Regs.  The seller has some flexibility in determining when to

account for sales, such as, for example, at the time of shipment or title passage or acceptance, but the expectation that some of the merchandise may be returned after the date of sale for credit or refund does not warrant the postponement of accrual. The way that the accrual method of accounting corrects the overstatement of income resulting from the return of merchandise is by allowing the seller a deduction in the year of return for the amount of the credit or refund given to the purchaser. In periods of generally rising sales and fairly constant rates of merchandise returns this method of accounting leads to persistent overstatement of income. In the print and sound recording industries, where merchandise returns regularly constitute a substantial percentage of total sales, the general accrual principles were perceived to be inconsistent with economic realities and unfair.

The Senate Finance Committee report accompanying the Revenue Act of 1978 gave its assessment of the problem as follows:

Reasons for change

Publishers and distributors of magazines, paperbacks, and records often sell more copies of their merchandise than it is anticipated will be sold to consumers. This "overstocking" is part of a mass-marketing promotion technique, which relies in part on conspicuous display of the merchandise and ability of the retailer promptly to satisfy consumer demand. Publishers usually bear the cost of such mass-marketing promotion by agreeing to repurchase unsold copies of merchandise from distributors, who in turn agree to repurchase unsold copies from retailers. These unsold items are commonly called "returns".

The generally accepted method of accounting for returns in the publishing industry is to record sales at the time merchandise is shipped and to establish an offsetting reserve for estimated returns. The effect of this accounting treatment is to report sales net of estimated returns. Tax accounting rules, however, do not permit gross income to be reduced for returns until the returned items are received, which may not occur until a taxable year subsequent to that in which the sale was recorded.

The committee believes that the present method of tax accounting for returns of magazines, paperbacks, and records does not accurately measure income for Federal income tax purposes and that it adversely affects publishers and distributors of these items. [S. Rept. 95-1278, at 4 (1978).]

The basic formula of section 458 was already developed in the 93d Congress in a provision that the House Ways and Means Committee included in its unreported tax reform bill of 1974. An identical provision was reported by the Committee in the 94th Congress as H.R. 5161 and was passed by voice vote of the House of Representatives in 1976. Miscellaneous Tax Bills: Hearings Before the Subcommittee on Miscellaneous Revenue Measures of the House Ways and Means Committee, 95th Cong., 1st Sess. 218 (Sept. 7 and 9, 1977) (hereinafter Ways and Means Committee Hearings). The provision would have allowed accrual basis publishers and distributors of periodicals to elect not to include sales income attributable to copies sold for display purposes which are returned within 2-1/2 months after the close of the tax year. A sale for display purposes was defined as a sale which was made in order to permit adequate display of the periodical, if at the time of the sale the taxpayer had a legal obligation to accept

returns of the periodical.  H. Rept. 94-1354, at 6-7 (1976).  The Senate Finance Committee, however, did not act on the bill, and it languished, partly because of the efforts of the paperback book and record industries, with the support of Treasury, to extend its coverage.  Ways and Means Committee Hearings, 218-220. The bill was resurrected, however, in the 95th Congress as H.R. 3050 and, after its coverage was extended to these industries, it was passed by both committees and incorporated in this form into the Revenue Act of 1978.

Section 458 provides, in pertinent part:

SEC. 458(a).  Exclusion From Gross Income.--A taxpayer who is on an accrual method of accounting may elect not to include in the gross income for the taxable year the income attributable to the qualified sale of any magazine, paperback, or record which is returned to the taxpayer before the close of the merchandise return period.

(b) Definitions and Special Rules.--For purposes of this section --

\*      \*      \*      \*      \*      \*      \*

(5) Qualified sale.--A sale of a magazine, paperback, or record is a qualified sale if--

(A) at the time of sale, the taxpayer has a legal obligation to adjust the sales price of such magazine, paperback, or record if it is not resold, and

(B) the sales price of such magazine, paperback, or record is adjusted by the taxpayer because of a failure to resell it.

(6) Amount excluded.--The amount excluded under this section with respect to any qualified sale shall be the lesser of --

(A) the amount covered by the legal obligation described in paragraph (5)(A), or

(B) the amount of the adjustment agreed to by the taxpayer before the close of the merchandise return period.

(7) Merchandise return period.--

(A) * * * the term "merchandise return period" means, with respect to any taxable year--

(i) in the case of magazines, the period of 2 months and 15 days first occurring after the close of the taxable year, ***

        *     *     *     *     *     *     *

(c) Qualified Sales to Which Section Applies.--

(1) Election of benefits.-- * * * An election under this section may be made without the consent of the Secretary.  * * *

Regulations under section 458 were proposed on August 31, 1984.  49 Fed. Reg. 34520.  Final regulations were published in the Federal Register on August 25, 1992, and made retroactive to the date of the proposed regulations.  57 Fed. Reg. 38596; sec. 1.458-1(a)(2), Income Tax Regs.  Paragraphs (c) and (g) of

section 1.458-1, Income Tax Regs., remained essentially identical

in the final version.  They provide:

> (c) <u>Amount of the exclusion</u> -- (1) In general.  Except
> as otherwise provided in paragraph (g) of this section,
> the amount of the gross income exclusion with respect
> to any qualified sale is equal to the lesser of --
>
> (i) [same as section 458(b)(6)(A)]
>
> (ii) [same as section 458(b)(6)(B)]
>
> *      *      *      *      *      *      *
>
> (g) <u>Adjustment to inventory and cost of goods sold</u>.
> (1) If a taxpayer makes adjustments to gross receipts
> for a taxable year under the method of accounting
> described in section 458, the taxpayer, in determining
> excludable gross income, is also required to make
> appropriate correlative adjustments to purchases or
> closing inventory and to cost of goods sold for the
> same taxable year.  Adjustments are appropriate, for
> example, where the taxpayer holds the merchandise
> returned for resale or where the taxpayer is entitled
> to receive a price adjustment from the person or entity
> that sold the merchandise to the taxpayer.  Cost of
> goods sold must be properly adjusted in accordance with
> the provisions of sec. 1.61-3 which provides, in
> pertinent part, that gross income derived from a
> manufacturing or merchandising business equals total
> sales less cost of goods sold.

The correlative adjustments contemplated by the Regulation are

illustrated by examples in subparagraph 2.  In Example 1, which

we shall adapt somewhat for the purposes of our discussion,

publisher sells 500 copies of its publication to distributor at

$1 each in year 1.  Under the sale agreement publisher has an

obligation to refund to distributor the full sales price for any

copies which distributor does not resell and returns, or from

which distributor removes and returns the cover, during the

statutory merchandise return period in year 2.  Distributor returns the covers from 100 copies within the merchandise return period.  Publisher's cost is 25 cents per copy.

In the absence of a section 458 election, publisher would compute its gross income for year 1 ($375) by taking the difference between sales revenues ($500) and cost of goods sold ($125).  Pursuant to section 458, publisher is entitled to exclude $100 from gross income.  Under these facts, no cost of goods sold adjustment is required because publisher does not hold the "returned" merchandise for resale.  Accordingly, its gross income is $275 ($400 - $125).  By contrast, if distributor returned unsold copies intact and publisher held them for resale to other customers, the Regulation would require publisher to compute its gross income ($300) as follows:  gross receipts adjusted for the exclusion ($500 - $100) less cost of goods sold adjusted for the addition to closing inventory ($125 - $25).

As Example 2 makes clear, if distributor resold the publications to retailer under a similar right-of-return arrangement, in no case would distributor be entitled to exclude the sales proceeds attributable to copies returned by retailer unless distributor reduced its cost of goods sold.  This is because, unlike publisher in the first variant of Example 1, distributor's costs are fully reimbursed.

The preamble to the final regulations acknowledged that during the period for public comment on the proposed regulations

a number of commentators had urged the Secretary to omit the cost of goods sold adjustment. The provision was retained, the preamble explains, because the language of section 458(a) indicates that the exclusion is determined on the basis of gross income, which for a seller of merchandise is defined in section 1.61-3(a), Income Tax Regs., as sales revenue less cost of goods sold, and because, in the Secretary's opinion, the cost of goods sold adjustment is necessary to clearly reflect income in accordance with section 446(b). 57 Fed. Reg. 38595.

## Discussion

### Congressional Intent With Respect to Cost Issues

We must decide whether the correlative cost of goods sold adjustment required by the Regulation contravenes the statute. "Under the test articulated in Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984), the first question a court must ask when reviewing an agency's construction of a statute is whether Congress has directly spoken to the precise question at issue and has expressed a clear intent as to its resolution." Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. 338, 359 (1994), affd. ___ F.3d ___ (8th Cir., Sept. 1, 1995); NationsBank v. Variable Annuity Life Ins. Co., 513 U.S. ___, ___, 115 S. Ct. 810, 813-814 (1995).

Petitioners contend that Congress has directly spoken to the precise question at issue in these cases. Petitioners' main argument runs as follows. Section 458(a) provides for an

election to exclude the income attributable to returned merchandise. "If the statute stopped there, the question of how to determine 'the income attributable to' the returned items of merchandise might well be a proper subject for further elaboration in regulations. The statute does not, however, stop there." Rather, in section 458(b)(6) it provides an explicit and unambiguous formula for determining the adjustment to income. The adjustment specified by Congress is the amount of the credit against sales price which the taxpayer is obligated to grant to the purchaser; the language of section 458(b)(6) leaves no room whatever for interpretation. Nevertheless, the regulations substitute their own formula for the formula specified by Congress. The formula for determining the "gross income exclusion" under section 1.458-1, Income Tax Regs., is the same as that for determining the statutory "amount excluded", "<u>except as otherwise provided in paragraph (g)</u>". Sec. 1.458-1(c), Income Tax Regs. (emphasis added). The offsetting cost adjustments required by paragraph (g) have the effect of "transform[ing] the 'amount excluded' from the amount of the credit given the retailers for returned items to an amount equal to the distributor's gross profit on those items." The Regulation does not validly interpret the statute; it changes the statute.

Petitioners' argument succeeds in demonstrating that the net effect of the cost adjustments required by the Regulation is to reduce gross income by the amount of the gross profit on returned

merchandise (what the regulations call "gross income exclusion" or "excludable gross income"), which amount is less than the full sales price adjustment (the statutory "amount excluded"). But this proposition was not in dispute. Respondent concedes it, and it is openly acknowledged in paragraphs (c) and (g) of the regulations themselves.

On the other hand, petitioners' conclusion that the Regulation is inconsistent with the statute does not necessarily follow. There is no inconsistency unless the statute precludes any further adjustment in the computation of gross income. It is the express premise of the Regulation that the statute has no such effect, because it purports to deal only with the method of accounting for gross receipts. The argument outlined above does not even challenge this premise, let alone persuade us that it is wrong.

The approach of the Regulation proceeds from the fundamental principle that the determination of gross income by a taxpayer who uses inventory comprises two separate calculations: inclusion of gross receipts and subtraction of cost of goods sold. Sec. 1.61-3(a), Income Tax Regs. Within this analytical framework it makes no sense to say that rules prescribing the treatment of costs "change" the determination of includable receipts. There is no question that the cost of goods sold adjustment provided for by the Regulation operates to offset, in whole or in part, the exclusion provided for by the statute. But

it is no more appropriate to conclude that this cost adjustment "changes the amount excluded" than to say that section 162 or section 263A "changes" the treatment of items under section 61. Thus, if the premise of the Regulation is correct, there is no conflict.

Petitioners' contention that there is a conflict depends upon proof that the amount of gross income that may be excluded is equal to the full "amount excluded" of section 458(b)(6). The statute does not say so explicitly: it does not define the "amount excluded" as the amount of gross income that a taxpayer may elect not to include; what it provides is that the "amount excluded" is the amount a taxpayer may elect not to include in gross income. If petitioners are correct to assume that when the statute speaks of items included in, and excluded from, gross income, Congress intended to refer to amounts of "gross income" within the meaning of section 1.61-3(a), Income Tax Regs., and not merely amounts of gross receipts, this intention ought to be discernible from the legislative history.

When one reviews the legislative history, not only is there no evidence that Congress regarded the "amount excluded" as an amount of gross income rather than gross receipts; one is struck by the complete absence of any explicit reference to the cost side of the relevant gross income computation. A few examples will suffice to illustrate that Congress appears to have been

concerned exclusively with the gross receipts side of the returned merchandise problem.

Both the House Ways and Means Committee report and the Senate Finance Committee report on H.R. 3050 contain substantially identical language describing the tax treatment of returned merchandise under prior law.  It reads:

> Under present law, sellers of merchandise who use an accrual method of accounting generally must <u>include sales proceeds in income</u> for the taxable year when all events have occurred which fix the right to receive the income and the amount can be determined with reasonable accuracy.  [H. Rept. 95-1091, at 3 (1978); S. Rept. 95-1278, at 4 (1978); emphasis added.]

An earlier report prepared for the House Ways and Means Committee by the Joint Committee on Taxation contains the following passages on current law:

> When sold goods are returned to a taxpayer during a taxable year the return generally is <u>treated as a reduction of gross sales</u> for purposes of financial and tax accounting.  * * *

> * * * The Internal Revenue Service has taken the position that accrual basis publishers and distributors must include the sales of the periodical in income when the periodicals are shipped to the retailers and may <u>exclude from income</u> returns of the periodicals only when the copies are returned by the retailer during the taxable year.  [Staff of the Jt. Comm. on Taxation, Description of Technical and Minor Bills Listed for a Hearing before the Subcommittee on Miscellaneous Revenue Measures of the Committee on Ways and Means on September 7 and 9, 1977, at 28-29 (1977); emphasis added.]

Identical language appears in H. Rept. 94-1354, at 2-3 (1976).

When the committees stated that under current law sales proceeds are included in income, they did not mean that the sales

proceeds represented the amount of the seller's <u>gross income</u> attributable to the sales.  We must presume that they were well aware that gross income from sales of inventory equals sales proceeds minus cost of goods sold.  That they were referring only to the tax treatment of receipts is also inferable from their formulation of the relevant all events test; it would not make sense to apply this test to accrual of costs.  Similarly, when the committees stated that the return of excess copies is accounted for by a "reduction of gross sales" or "exclu[sion] from income", they could not have meant that gross income was reduced by this amount, since the seller's cost of goods sold must be reduced as well.  Sec. 1.471-1, Income Tax Regs.  If Congress was not referring to amounts of gross income when it discussed the accrual of income under current law, it is only reasonable to infer that Congress was also not referring to amounts of gross income when it defined the scope of the election not to accrue.

For whatever reason, Congress did not choose to formulate the problem of merchandise returns in terms of gross income.  We can only conclude that Congress simply was not concerned with the inventory and cost accounting issues that the returned merchandise problem involved, and consequently could not have possessed a specific intent to prescribe, or preclude, rules to handle these issues.

Petitioners read the legislative history differently.  In their view, these materials disclose that Congress specifically intended that taxpayers electing to exclude sales proceeds also continue to be entitled to deduct the cost of goods sold in the year of the sales.  The asymmetrical treatment of revenues and costs that the Regulation seeks to correct was actually a deliberate choice to remedy the problem as Congress perceived it.  Petitioners' argument attaches great significance to the characterization of excess copies as promotional materials which appears in all of the committee reports, the hearings, and the text of the original bills.  H.R. 5161 and H.R. 3050, before their amendment in the second session of the 95th Congress, would have applied to "sales of magazines or other periodicals for display purposes."  The House and Senate reports on H.R. 3050 described the deliberate overstocking of retailers by distributors as "a mass-marketing promotion technique".  H. Rept. 95-1091, supra at 3; S. Rept. 95-1278, supra at 4.  Petitioners conclude from this evidence that Congress "chose, through section 458, to treat the transfer of * * * [excess copies] to retailers as a promotional device, not as a sale.  Accordingly, section 458 eliminates the sale proceeds but not the distributors' cost for the display items."  We are not persuaded.

What is clear from the legislative history is that Congress believed that the shipment of excess copies by publishers and distributors to retailers with no expectation that they would be

sold should not be treated as a sale for purposes of the accrual of income.  See H. Rept. 94-1354, supra at 3.  It does not follow, however, that Congress believed these shipments should be deductible as promotional expenses.  Reading the many statements characterizing the distribution of excess copies as a promotional device in context, we think it likely that they were intended only to provide a reason why treatment of the transaction as a sale for tax purposes was inappropriate, and not a reason why the costs should be deductible.  Were we to accept petitioners' interpretation arguendo, the very fact that such statements are so numerous in the legislative history would make it all the more puzzling that there is no explicit statement of petitioners' conclusion that costs attributable to the excess copies should be deducted in full in the year of shipment.

Petitioners' argument fails to explain why Congress did not expressly provide for the deduction which, in their view, Congress intended.  We gather from petitioners' brief that they believe Congress felt it unnecessary to act to secure the cost of goods sold deduction for excess copies because this deduction would be available under the general principles of inventory accounting set forth in section 1.471-1, Income Tax Regs.  We think it unlikely that Congress would have understood section 1.471-1, Income Tax Regs., and the other applicable provisions of the Code and regulations to apply in this way.

The purpose of maintaining inventories is to assure that the costs of producing or acquiring goods are matched with the revenues realized from their sale. <u>Hamilton Indus. v. Commissioner</u>, 97 T.C. 120, 130 (1991); <u>Rotolo v. Commissioner</u>, 88 T.C. 1500, 1515 (1987). Inventory accounting accomplishes this by accumulating production or acquisition costs in an inventory account rather than allowing an immediate deduction for the costs when they are incurred. When the related goods are sold, these costs are removed from the inventory account and recorded as costs of sale, which reduce taxable income for the year of sale. The matching principle is fundamental to inventory accounting and is required by the definition of gross income for a manufacturing or merchandising business. Sec. 1.61-3(a), Income Tax Regs. An item is not removed from closing inventory and reflected in cost of goods sold until the income from the item is realized under the taxpayer's method of accounting.

Accounting for inventories is governed by sections 446 and 471. Section 446(b) provides that the taxpayer's method of accounting must clearly reflect income in the opinion of the Secretary. Section 471 provides that inventories shall be taken on such basis as the Secretary prescribes and establishes "two distinct tests to which an inventory must conform. First it must conform 'as nearly as may be' to the 'best accounting practice,' a phrase that is synonymous with 'generally accepted accounting principles.' Second, it 'must clearly reflect the income.'"

Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979).

Sections 1.471-1 and 1.471-2, Income Tax Regs., provide general guidance for determining the timing of inventory adjustments in order to satisfy the requirements of section 471. Thus, as a general matter, the seller must remove an item from inventory when title passes to the purchaser. If the item is returned, it is included in inventory for the year of return.

When a taxpayer elects to exclude sales revenue attributable to an item under the section 458 election, removing the item from inventory and deducting its cost would not be consistent with the requirements of section 471. First, such treatment would deviate from generally accepted accounting principles. Under these principles, sales with right of return are accounted for by symmetrical reductions in both the sales account and the cost of goods sold adjustment account to reflect estimates of future returns. See SFAS No. 48 (June 1981); Jarnagin, Financial Accounting Standards 610-612 (16th ed. 1994); Kay & Searfoss, Handbook of Accounting and Auditing 13-11 to 13-12 (2d ed. 1989). Second, the mismatching of income and expense would not clearly reflect income. Petitioners' argument requires us to assume that Congress intended a result that would have conflicted with section 471. Thus, it was not in reliance on general inventory accounting principles that Congress omitted to provide for the cost deduction that petitioners believe Congress intended. On the other hand, if it was Congress' intention to create an

exception to section 471, they would have done so expressly. They did not. In short, petitioners have offered no plausible explanation, and we can find none ourselves, that would account for the fact that the language of section 458 does not reflect the purposes that they ascribe to Congress.

Moreover, even if we assumed that Congress did intend costs incurred through overstocking to be deductible, we would not be persuaded that the Regulation is inconsistent with that intent. The Regulation allows a taxpayer to forgo correlative cost adjustments with respect to excess copies to the extent that the taxpayer actually bears the costs. Petitioners would have us believe that Congress intended the same promotional costs to be deducted twice: once by the publisher who actually bore them and once by the distributor like Curtis who is fully reimbursed. This treatment obviously has the potential to become an abusive tax shelter: one can imagine a lengthening of the distribution chain through the interposition between publisher and retail merchant of additional, unnecessary wholesalers that enjoy the benefit of a deduction without committing any resources or bearing risk. In the absence of any direct evidence, we refuse to believe that Congress would have been so indiscriminate and foolhardy in the bestowal of tax benefits.

Finally, we find some evidence in the legislative history that contradicts the view that Congress intended asymmetrical treatment of revenues and costs. Most importantly, as respondent

points out, one objective of the returned merchandise election legislation seems to have been to reconcile the tax treatment of merchandise returns with the financial accounting treatment. The need for greater consistency was discussed in the House Ways and Means Committee report on H.R. 5161:

> Your committee recognizes that the tax accounting rules contain numerous variances from generally accepted accounting principles which should be the subject for legislative review so that those variances which are not appropriate may be eliminated. * * * In the meantime, your committee believes that the attempt by the Internal Revenue Service to tax the periodicals sold for display purposes could produce a significant distortion of income. * * * Thus, your committee does not believe it is appropriate to delay this legislation until a general solution to accounting problems is found. [H. Rept. 94-1354, at 3 (1976).]

The approach adopted by Congress was not identical to the reserve for estimated returns recognized under generally accepted accounting principles, even though its effect was intended to be substantially the same. As the House Ways and Means Committee report on H.R. 3050 observed:

> The method of accounting provided for under the election differs from that used for financial reporting purposes, in that the amount of reduction in gross income pursuant to the election is limited by actual returns during the merchandise return period, while under financial accounting rules, the reduction may be based on an estimate of future returns. [H. Rept. 95-1091, at 4 (1978).]

The Report mentions only this difference, however. Petitioners' position implies that the effect of the legislation was to harmonize tax accounting with financial accounting in one respect while creating a new discrepancy in another respect. The

inconsistency between an asymmetrical treatment of revenues and costs for tax purposes and the symmetrical treatment required by generally accepted accounting principles would not have gone unnoticed. Surely, Treasury or the committee staff would have believed such a discrepancy required explicit justification. Their unanimous silence indicates that no such discrepancy was anticipated, let alone intended.

For all the foregoing reasons, we find petitioners' reading of congressional intent wholly unpersuasive, and we reject it.[3]

---

[3] Petitioners attack the Regulation on a number of additional grounds. First, they argue that other provisions of the regulations under sec. 458 adopt their view. In particular, they point to sec. 1.458-1(e), Income Tax Regs., which deals with the operation of the suspense account required by sec. 458(e) as a transitional adjustment mechanism. Because sec. 1.458-1(e), Income Tax Regs., tracks the statutory language closely in explaining the derivation of the "amount excluded" and fails to mention cost of goods sold adjustments, petitioners conclude that respondent has implicitly conceded that cost of goods sold adjustments do not comport with the statutory scheme. We disagree. The reason there is no reference to correlative adjustments under par. (g) in the discussion of the suspense account mechanics in par. (e) is that the cross-reference appears in par. (g). Sec. 1.458-1(g)(2), Income Tax Regs. A careful reading of par. (g) leaves no doubt whatever that the Regulation requires correlative cost adjustments to be made in the computation of gross income using the suspense account.

Second, petitioners argue that the Regulation is inconsistent with sec. 458(c)(1), which provides that "An election under this section may be made without the consent of the Secretary." Petitioners read this provision as prohibiting the Secretary from establishing additional requirements for the election. We think this argument represents a misunderstanding of sec. 458(c)(1). This paragraph deals only with procedural matters: a taxpayer must make an election to claim the benefits of the statute; the election shall be made in such manner as the Secretary prescribes, and no later than the deadline for filing

(continued...)

Secretary's Authority To Resolve Cost Issues

This Court and others have struck down regulations that did not harmonize with the language, origin, and purpose of the statute which they purported to interpret.  United States v. Vogel Fertilizer Co., 455 U.S. 16, 24-25 (1982); Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. 338 (1994); Hughes Intl. Sales Corp. v. Commissioner, 100 T.C. 293 (1993); Jackson Family Found. v. Commissioner, 97 T.C. 534 (1991), affd. 15 F.3d 917 (9th Cir. 1994); Durbin Paper Stock Co. v. Commissioner, 80 T.C. 252 (1983).  Petitioners have attempted to cast these cases in the mold of those decisions.  Thus, petitioners argue that the Regulation represents an impermissible attempt to amend rather than merely interpret the statute, quoting language from our

---

[3](...continued)
the tax return for the year to which the election applies.  From the context it is quite clear that Congress did not intend this provision as a substantive limitation on the Secretary's rule-making authority.

It is likely that Congress added this provision out of a consideration for administrative efficiency.  Sec. 458(c)(4) provides that computation of taxable income under an election shall be treated as a method of accounting.  The election would therefore constitute a change in method of accounting, which ordinarily would require the taxpayer to follow procedures for obtaining the Secretary's consent.  Sec. 446(e).  Congress anticipated a large number of similarly situated taxpayers would make the election and did not believe that review of each applicant's particular circumstances would be necessary. Petitioners' reading would imply that the Secretary could not disallow use of the method of accounting under sec. 458 even if the taxpayer was using it in a manner that conflicted with other provisions of the Code and regulations.  There is no evidence that Congress intended sec. 458 to supersede all other tax law.

decisions:  "'[R]espondent has no power to promulgate a regulation adding provisions that he believes Congress should have included but did not."  Durbin Paper Stock v. Commissioner, supra at 261.  "Respondent may not usurp the authority of Congress by adding restrictions to a statute which are not there.'"  Id. at 257 (quoting Estate of Boeshore v. Commissioner, 78 T.C. 523, 527 (1982)).  "[T]he regulation may not construct an amendment to the statute."  Jackson Family Found. v. Commissioner, supra at 538.

Petitioners' reliance on this line of cases is misplaced. In each of the cases cited the regulation directly conflicted with the statute it purported to interpret.  United States v. Vogel Fertilizer, supra at 26 ("regulation is fundamentally at odds with the manifest congressional design"); Western Natl. Mut. Ins. Co. v. Commissioner, supra at 360 ("The statute here is neither silent nor ambiguous with respect to the specific issue in question"); Hughes Intl. Sales Corp. v. Commissioner, supra at 305 ("The legislative history directly undercuts section 1.993-6(e)(1), Income Tax Regs."); Durbin Paper Stock Co. v. Commissioner, supra at 257 ("Where the provisions of the statute are unambiguous and its directive specific, there is no power to amend it by regulation.").  We have already explained at length why we believe the Regulation in these cases is not inconsistent with the statute.  Here there is no unambiguous, specific

statutory directive and no manifest congressional design with respect to the treatment of costs under a section 458 election.

To invoke these passages from our decisions for the general proposition that regulations may not add rules not found in the statute and not precluded by the statute is to misread them. Indeed, supplementation of a statute is a necessary and proper part of the Secretary's role in the administration of our tax laws.  As the Supreme Court stated in Chevron, U.S.A. v. Natural Res. Def. Council, 467 U.S. at 842-843:

> If the intent of Congress is clear, that is the end of the matter,  * * *  if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."  * * *  [Citations omitted.]

"Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'" Commissioner v. Portland Cement Co., 450 U.S. 156, 169 (1981) (quoting Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501 (1948).  There is no evidence that the Regulation conflicts with either the language or the purpose of section 458.  We believe the Regulation provides an eminently reasonable solution to a problem that the statute does not address.  The correlative cost adjustments it requires follow settled principles of tax accounting and are consistent with generally accepted accounting

principles.  The limited application of the requirements reflects a sensible distinction between costs that are actually borne and costs that are not.  The Secretary possessed the authority to promulgate section 1.458-1(g), Income Tax Regs., and exercised that authority reasonably.

We have considered petitioners' other arguments and find them to be without merit.  To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.